158 F.3d 92
 Robert KESSLER, Vicki Cheikes, Plaintiffs-Appellants,
v.
GRAND CENTRAL DISTRICT MANAGEMENT ASSOCIATION, INC.,
Defendant-Appellee,
Dennis C. Vacco, Attorney General of the State of New York,
City of New York, Intervenors-Defendants-Appellees.
 Docket No. 97-7503.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 4, 1998.
Final Supplemental Briefs Decided Aug. 28, 1998.
Decided Oct. 13, 1998.
 
 David J. Kennedy, New Haven, Connecticut (Robert Solomon, Jerome N. Frank Legal Services Organization, New Haven, Connecticut, Douglas Lasdon, Urban Justice Center, New York, New York, on the brief), for Plaintiffs-Appellants.
 
 
 1
 R. Hewitt Pate, Richmond, Virginia (Sarah C. Johnson, Hunton & Williams, Richmond, Virginia, Myron D. Cohen, Hunton & Williams, New York, New York, on the brief), for Defendant-Appellee.
 
 
 2
 Constantine A. Speres, Assistant Attorney General, New York, New York (Dennis C. Vacco, Attorney General of the State of New York, Thomas D. Hughes, Assistant Solicitor General, Charles F. Sanders, Assistant Attorney General, New York, New York, on the brief), for Intervenor-Defendant-Appellee Dennis C. Vacco.
 
 
 3
 Cheryl Payer, Assistant Corporation Counsel, New York, New York (Paul A. Crotty, Corporation Counsel of the City of New York, Ellen B. Fishman, Robin Binder, Assistant Corporation Counsel, New York, New York, on the brief), for Intervenor-Defendant-Appellee City of New York.
 
 
 4
 Before: KEARSE and WALKER, Circuit Judges, and WEINSTEIN, District Judge.* 
 
 KEARSE, Circuit Judge:
 
 5
 Plaintiffs Robert Kessler and Vicki Cheikes, residents of the Grand Central Business Improvement District ("Grand Central BID" or "GCBID") in midtown Manhattan, appeal from a judgment of the United States District Court for the Southern District of New York, Shira A. Scheindlin, Judge, dismissing their complaint alleging that defendant Grand Central District Management Association, Inc. ("GCDMA"), the manager of the Grand Central BID, denies them equal voting power in the election of GCDMA's board of directors ("Board"), in violation of the Equal Protection Clause of the Fourteenth Amendment. The district court granted the summary judgment motion of GCDMA and intervenors-defendants City of New York (the "City") and Dennis C. Vacco, Attorney General of the State of New York (collectively "defendants"), on the ground that the Grand Central BID is a special, limited-purpose entity that disproportionately affects one class of GCBID constituents, and that GCDMA's system for electing Board members is thus not subject to the requirement of "one person, one vote." On appeal, plaintiffs contend principally that GCDMA's management of the Grand Central BID entails the exercise of general governmental power sufficient to require that Board elections comply with the one-person-one-vote requirement. We affirm.
 
 I. BACKGROUND
 
 6
 To promote commercial development in urban areas, the New York State ("State") legislature has authorized municipalities in the State to establish business improvement districts ("BIDs"). In a BID, owners of nonexempt real property pay a periodic assessment to the municipality, over and above their ordinary municipal taxes. That assessment money is used to fund the construction of capital improvements to land in the district and the provision of certain services intended to promote business activity in the district.
 
 
 7
 The State's Business Improvement District Act, N.Y. Gen. Mun. Law § 980 et seq. (McKinney Supp.1998) (the "Act"), which was made applicable to the City by N.Y.C. Admin. Code § 25-401 et seq. (1998), generally sets forth both the procedures for establishing a BID and the mechanics of BID operation, including the representational structure of the governing Board. The following facts with respect to the Grand Central BID and GCDMA have been stipulated by the parties.
 
 A. Establishment and Functions of BIDs
 1. The Statutory Scheme
 
 8
 The establishment of a BID begins with the preparation of a "district plan." N.Y. Gen. Mun. Law § 980-d(a). The district plan must set forth the geographical boundaries of the proposed BID, see id. §§ 980-a(a), (b)(1), along with "a list of the properties to be benefited," id. § 980-a(b)(8). All of the "real property benefited [must be] included within the limits of the proposed [BID]," id. § 980-f(a)(3), and all of the taxable property included in the proposed BID must benefit from the BID's establishment, see id. § 980-f(a)(2). The district plan must also, inter alia, describe any proposed capital improvements, see id. § 980-a(b)(3), and state "the proposed time for implementation and completion of the district plan," id. § 980-a(b)(6). With respect to financing, the district plan must, inter alia, specify the total cost of the proposed improvements, see § 980-a(b)(3); state the "total annual amount proposed to be expended for improvements, maintenance and operation," id. § 980-a(b)(4); explain the proposed sources of funding, see id. § 980-a(b)(5); and provide "a statement of the method or methods by which the expenses of [the] district will be imposed upon benefited real property, in proportion to the benefit received by such property," id. § 980-a(b)(8).
 
 
 9
 In a municipality with a population of one million or more, the local planning commission and various officials are given an opportunity to review the district plan and submit comments to the municipality's legislative body ("municipal council"). See id. § 980-d(c). If the municipal council wishes to proceed with the establishment of the BID, it must hold a public hearing on the subject. See id. § 980-e. Property owners are given 30 days after the hearing in which to file written objections to the formation of the BID. See id. § 980-e(b). Absent sufficient objections, the municipal council may adopt a local law providing for the BID's establishment. See id. § 980-f(c). After review by the State's comptroller for compliance with certain financial restrictions, that law will take effect. See id. § 980-g.
 
 
 10
 After a BID is established, "the legislative body [of the municipality] shall have authority," id. § 980-c, to make physical improvements to "municipally or [BID] owned or leased property which will restore or promote business activity in the district," such as the renovation of streets and sidewalks, the creation of parks and parking lots, and the installation of better lighting and signage, id. § 980-c(a). The municipality may also provide "enhanced sanitation services," "services to enhance the security of persons and property," and
 
 
 11
 other additional services required for the enjoyment and protection of the public and the promotion and enhancement of the district whether or not in conjunction with improvements authorized by this section.
 
 
 12
 Id. § 980-c(c). These services "must be in addition to or an enhancement of those provided by the municipality prior to the establishment of the [BID]." Id. § 980-j(a).
 
 
 13
 For each BID, there must be established a not-for-profit corporation called a "district management association," which is charged with "carrying out such activities as may be prescribed in the [district] plan." Id. § 980-m(a). The district management association "may make recommendations to the [municipal council] with respect to any matter involving or relating to" its BID, id. § 980-m(c), and "upon [such a] recommendation," the municipal council may amend the district plan, id. § 980-i(a). "[W]here there is no indebtedness, outstanding and unpaid, incurred to accomplish any of the purposes of the [BID]," the municipal council has the power to dissolve a BID, after giving the management association an opportunity to make a recommendation concerning dissolution. Id. § 980-n(a). A BID will also be dissolved upon the petition of a sufficient number of property owners. See id.
 
 2. The Grand Central BID
 
 14
 The Grand Central BID was established in 1988, and its territory was extended in June 1995, pursuant to the procedures set forth in the Act and the corresponding City ordinances. As extended, the Grand Central BID encompasses 337 properties on sections of 75 blocks in midtown Manhattan, including the Grand Central Terminal railroad station. There are 242 owners of property within the GCBID. That property includes approximately 71 million square feet of commercial space, constituting approximately 19% of the total commercial space in Manhattan. The office space in the GCBID "exceeds the entire space inventory of the Central Business District in such cities as Houston, San Francisco, Dallas, Denver, and Boston." (District Plan, as Amended, for the Grand Central BID dated June 30, 1994 ("District Plan"), § II.B.). The GCBID also contains approximately 897,000 square feet of residential space, occupied by approximately 930 residents.
 
 
 15
 The District Plan authorizes the construction of capital improvements (the "Improvements") and the provision of additional services (the "Services") in the GCBID. The Improvements include the renovation of sidewalks and crosswalks; the planting of trees; the installation of new lighting, street signs, bus shelters, news kiosks, and trash receptacles; contributions to the renovation of Grand Central Terminal; and "the creation of a restaurant facility" on 42nd Street. (Id. § IV.A.) The Services "may include any services required for the enjoyment and protection of the public and the promotion and enhancement of the District," including
 
 1. security
 2. sanitation
 3. tourist information
 4. social services for homeless persons
 5. special maintenance and repair
 6. public events
 
 16
 7. retail improvements.
 
 
 17
 (Id. § III.A.)
 
 
 18
 Pursuant to a contract between the City Department of Business Services and GCDMA dated July 30, 1993 (the "Contract"), GCDMA became the Grand Central BID's management association. The original Contract was to expire on June 30, 1998, subject to renewal for a five-year term at the "sole discretion" of the City. (Id. § 1.03.) That expiration date was extended to July 31, 1998, and the Contract has not been renewed, although the City has not contracted with another entity to serve as manager. As discussed in Part II.A. below, GCDMA currently continues to manage the Grand Central BID.
 
 
 19
 To carry out the District Plan, GCDMA, through its operating entity, Grand Central Partnership, Inc., employs approximately 63 security guards, most of whom are unarmed. These guards "patrol the streets and sidewalks of the District" and "attempt[ ] to obtain compliance with City regulations controlling vending, sidewalk obstructions, noise generation, and air pollution." (Id. § III.A.1.) They are "tied into [the New York City Police Department's] communications network" and act "[i]n cooperation with [the New York City Police Department] and the building staffs of private property-owners." (Id.) GCDMA employs "sanitation" workers, who perform functions such as sweeping sidewalks and streets, as well as removing graffiti, washing sidewalks, caring for trees and plants, "poster removal, cleaning street signs, and repainting street furniture." (Id. § III.A.2.) These workers bag trash, which is in due course collected by the City's Department of Sanitation in the normal course of its refuse removal duties. GCDMA also provides other services to improve the attractiveness of the district, such as giving free assistance to retailers in removing old signs and designing new signs and facades; and it provides assistance in complying with applicable City ordinances.
 
 
 20
 In addition, GCDMA contributes to the funding and operation of a 24-hour "outreach, assessment and referral" facility for homeless persons that provides services such as job training. (Id. § III.A.4.) Other GCDMA Services include operating tourist information booths in the district and sponsoring events, such as an alcohol-free New Year's Eve celebration, in the district's public spaces. GCDMA "retains the flexibility to eliminate or add to" the Services listed in the District Plan. (Id. § III.A.)
 
 3. Funding and Expenditures
 
 21
 The primary source of funding for the Grand Central BID is an assessment that the City levies against and collects from all industrial, commercial, and residential property within the district. (See District Plan § V.B.) The GCBID is divided into two geographic sections, and the rate of the assessment in each section is calculated by dividing the annual budget for that section by the total taxable square footage in that section. (See id.) All industrial, commercial, and residential properties within a section are assessed at the same rate per square foot. In addition to the funds received through assessment, GCDMA may receive money from donations, limited borrowing, licensing City-owned land in the district for private use, and "any other source." (See id. §§ V.C.--V.F.)
 
 
 22
 The Act provides that the assessment is to be "determined, levied and collected in the same manner, at the same time and by the same officers, as general municipal taxes are levied and collected." N.Y. Gen. Mun. Law § 980-j(b). Any assessment money that the City collects must be "separately accounted for in the books and records" of the City and may not be "used for any purposes other than those set forth in the district plan." Id. § 980-l (a).
 
 
 23
 As contemplated by the District Plan, GCDMA received the GCBID assessment money from the City in accordance with the Contract. The Contract required GCDMA to provide the Improvements and the Services, substantially as they are described in the District Plan. In return for GCDMA's providing the Improvements and the Services, the City was generally required to give GCDMA the full amount of the assessments against property within the GCBID, plus interest, that the City has actually collected.
 
 
 24
 Both the Contract and the District Plan, however, placed certain restrictions on GCDMA's use of the assessment money and other GCBID funds. Each year GCDMA was required to develop a proposed budget setting forth, separately for the Improvements and the Services, the total amounts to be expended in that year and "reasonably itemiz[ing]" the proposed expenditures. (District Plan § VI.B.2.) The proposed budget was not to exceed the total annual amount approved by the City's legislative body, i.e., the City Council, and set forth in the District Plan. See, e.g., N.Y. Gen. Mun. Law § 980-a(b)(4); District Plan § VI.C.1. That amount could not be increased except by the City Council after a public hearing. See id. § 980-i(b). GCDMA may, however, revise the itemization in a given budget. (District Plan § VI.C.4.)
 
 
 25
 GCDMA's proposed annual budgets, along with a detailed account of the previous year's expenditures, were required to be submitted to the Commissioner of the City's Department of Business Services (the "Commissioner"). Before GCDMA may construct an Improvement, it must submit "designs, plans and specifications" to the City for approval. (Contract § 2B.04.) Further, the Commissioner is given authority
 
 
 26
 to determine the amount, quality, acceptability and fitness of the work being performed by [GCDMA] under th[e] Contract, and ... to withhold any [assessment money] if he or she determines that the provisions of th[e] Contract have not been materially complied with.
 
 
 27
 (Contract § 1.05.) The performance of the Services is "subject to the review and reasonable direction and control of the Commissioner." (Id. § 2A.04(a).) If the Commissioner "reasonably finds, after considering all the facts and circumstances," that specific Services "for which [GCDMA] has allocated [assessment money] in its annual budget" have not been "satisfactorily performed," the Commissioner may order the performance of those Services. (Id. § 2A.04(b).) If GCDMA fails to follow that order,
 
 
 28
 the City shall have the right, upon notice to [GCDMA], to perform such work for [GCDMA], and to charge [GCDMA] therefor and shall have the right, without limitation as to other remedies, to deduct its costs of doing such work from the next installment or installments of [assessment money] to be paid to [GCDMA].
 
 
 29
 (Id.)
 
 
 30
 4. Representation in the Management of GCDMA
 
 
 31
 The Act provides that the board of directors of the management association of a BID is to consist of
 
 
 32
 representatives of owners and tenants within the [BID], provided, however, that not less than a majority of its members shall represent owners and provided further that tenants of commercial space and dwelling units within the [BID] shall also be represented on the board,
 
 
 33
 along with, in a municipality "having a population of one million or more,"
 
 
 34
 one member appointed by each of the following: the chief executive officer of the municipality, the chief financial officer of the municipality[,] .... the borough president of the borough in which the [BID] is located[,] and ... the council member representing the council district in which the [BID] is located, or if the [BID] is located in more than one council district, the fourth additional member will be appointed by the speaker of the city council,
 
 
 35
 id. § 980-m(b) (emphasis added). Thus, while the management association's board is to include representatives of both property owners and tenants, the owners have the right to elect a majority of the directors.
 
 
 36
 GCDMA's bylaws provide for a Board comprising groups of directors selected by four voting classes:
 
 
 37
 a) Class A. Owners of record of real property in the [D]istrict ... or such other persons as are registered with the City of New York to receive real property tax bills for property located in the District [are eligible to] be Class A members of [GCDMA].
 
 
 38
 b) Class B. Tenants not eligible for Class A membership, who are occupants pursuant to leases of commercial space within the District ... [are eligible to] be Class B members of [GCDMA].
 
 
 39
 c) Class C. Tenants not eligible for Class A or Class B membership, who are occupants pursuant to leases of dwelling units within the District ... [are eligible to] be Class C members of [GCDMA].
 
 
 40
 d) Class D. The persons serving from time to time as directors of [GCDMA] by virtue of their appointment by [City officials] shall be Class D members of [GCDMA].
 
 
 41
 (Bylaws of GCDMA dated December 20, 1988 ("Bylaws"), Art. I, § 1.)
 
 
 42
 GCDMA holds annual elections, in which each class of voters separately elects a specified number of directors. In accordance with N.Y. Gen. Mun. Law § 980-m(b) and the corresponding N.Y.C. Admin. Code § 25-414(b), GCDMA's bylaws provide that "the number of Class A Directors shall at no time constitute less than a majority of the Board." (Bylaws Art. II, § 1.) Currently, in addition to the four Class D directors appointed by the City, GCDMA's Board is composed of 31 directors elected by the members of Class A, 16 directors elected by the members of Class B, and one director elected by the members of Class C.
 
 B. The Present Action
 
 43
 Plaintiffs are residents of the Grand Central BID. They live in an apartment building at 372 Fifth Avenue, which was added to the GCBID in June 1995. Plaintiffs' building is owned by a cooperative association, in which they hold shares. That cooperative association, as an owner of property within the GCBID, is entitled to Class A membership in GCDMA. As non-property-owning noncommercial residents, plaintiffs individually are entitled only to Class C membership.
 
 
 44
 Plaintiffs commenced the present action in November 1995 pursuant to 42 U.S.C. § 1983 (1994). As amended, their complaint asserted that the "system of voting" for GCDMA Board members "privileges one class of district members over another without regard to actual number or place of residence" (Third Amended Complaint p 24), and that
 
 
 45
 [b]ecause residents are consigned to a permanent minority status on the Board even though they are numerically superior to the class of owners of property within the district, they are deprived of any meaningful opportunity to advance their interests concerning GCDMA activities
 
 
 46
 (id. p 25). Plaintiffs contended that GCDMA provides general services to the whole district, funded by a general mandatory tax, and that its functions are neither narrow in scope nor limited in purpose and thus give it the character of local government. They sought, inter alia, a declaration that
 
 
 47
 the system of representation on the Board ... violates the Equal Protection Clause by denying to the plaintiffs, who are residential tenants in the district, representation on the basis of the principle of one person, one vote
 
 
 48
 (id. at 9, p A), and they requested a permanent injunction ensuring plaintiffs equal voting rights.
 
 
 49
 In defense, GCDMA contended that the one-person-one-vote requirement is inapplicable on the ground that GCDMA falls within the exception to that requirement established by Salyer Land Co. v. Tulare Lake Basin Water Storage District, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), and Ball v. James, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981). GCDMA argued that (a) it does not exercise general governmental powers, (b) it does not supplant or replace local government because it merely provides certain services in addition to and not in lieu of the services provided by the City, (c) its activities are subject to the supervision and control of the City, and (d) its activities affect property owners disproportionately. The State intervened in the action to defend the constitutionality of the Act's provision governing the composition of BID management associations' boards of directors, N.Y. Gen. Mun. Law § 980-m(b); and the City intervened to defend the corresponding City ordinance, N.Y.C. Admin. Code § 25-414(b). The City and the State presented arguments on the merits similar to those presented by GCDMA.
 
 
 50
 Both sides moved for summary judgment, and the case was submitted to the district court on the stipulated facts. In an opinion reported at 960 F.Supp. 760 (1997), the district court upheld the system for electing GCDMA's Board as constitutional, relying on the principle that
 
 
 51
 [t]he strictures of one-person, one-vote do not apply to a governmental body that has a special limited purpose and performs activities that have a disproportionate effect on a definable group of constituents.
 
 
 52
 Id. at 771 (citing Salyer Land Co. v. Tulare Lake Basin Water Storage District, 410 U.S. at 728, 93 S.Ct. 1224, and Ball v. James, 451 U.S. at 370, 101 S.Ct. 1811).
 
 
 53
 The district court acknowledged that GCDMA performs a wider range of functions than were performed by the governmental bodies at issue in Salyer and certain other Supreme Court cases, but the court concluded that GCDMA's functions "bear a close relationship to the [Grand Central] BID's purpose, which is restoring and promoting business activity in the District." 960 F.Supp. at 774. The court also noted that GCDMA "lacks regulatory power" and "does not have the power to levy and collect taxes, or to set tax rates." Id. at 773. "Most importantly," the district court found that "residents within the district still have recourse to their own elected officials." Id. at 774.
 
 
 54
 GCDMA's provision of ... services merely supplements and does not replace the City's services.... [T]his is significant because residents within the BID are not without recourse should they be displeased with the [services] in their area.... Residents can still appeal to their elected representatives if the City's provision of [services] is inadequate.
 
 
 55
 Id. at 774. Citing the City's role in the formation of the Grand Central BID and the presence of City officials' appointees on the Board, the court found that residents were further protected because GCDMA was subject to "a high level of municipal control." Id. at 773. With respect to the GCBID's effects, the court stated that the property owners "foot the bill" for GCDMA's activities by paying the assessment and that they receive a "significant benefit" in the form of increased property values. Id. at 775. Thus, the owners as a group are the persons who are "primarily burdened and benefited" by the Grand Central BID. Id. (internal quotation marks omitted).
 
 
 56
 The district court concluded that Board elections are not subject to the one-person-one-vote requirement, but "need only be reasonably related to the purpose of the [Grand Central] BID to satisfy the Equal Protection Clause." Id. The court upheld the voting scheme on the ground that "[t]he New York State Legislature could ... reasonably conclude that property owners would not have agreed to subject their property to ... an assessment unless they had a dominant role in determining how that revenue would be allocated." Id.
 
 
 57
 The complaint was dismissed, and this appeal followed.
 
 II. DISCUSSION
 
 58
 On appeal, plaintiffs pursue their contention that GCDMA performs such broad governmental functions that its Board is subject to the one-person-one-vote requirement. Though the matter is not free from doubt, we agree with the district court that the limited functions and powers of GCDMA, and the disproportionate effects of its activities, place it within the Salyer-Ball exception to that requirement.
 
 A. Mootness
 
 59
 Preliminarily, we consider whether, in light of the July 31, 1998 expiration of the Contract between GCDMA and the City, plaintiffs' challenge to the makeup of the GCDMA Board continues to present a live case or controversy. Following newspaper reports that the City had declined to renew the Contract, we asked the parties to submit supplemental briefs as to whether the case had thereby become moot. Notwithstanding the State's somewhat peculiar response that consideration of the question of mootness is premature, we conclude for several reasons that the case is not moot.
 
 
 60
 First, the GCBID itself has not been dissolved, and the City informs us that GCDMA continues to perform management duties that have survived the expiration of the Contract:
 
 
 61
 GCDMA continues in existence, it continues to disburse funds previously received or which it is currently receiving under formerly established procedures, and its Board continues to govern the association, under the challenged bylaws and statutory provisions.
 
 
 62
 (City's Supplemental Brief at 3.) Thus, the board of directors whose makeup plaintiffs challenge remains in operation.
 
 
 63
 Further, both the City and GCDMA inform us that negotiations are ongoing between them for a new contract. Although the City states that "[i]t remains unclear whether agreement can be reached on any new contract between the parties" (id.), GCDMA states that its negotiations with the City for a new agreement allowing GCDMA to continue as GCBID's manager are "active" (GCDMA's Supplemental Brief at 1). Thus, it may well be that GCDMA, with its currently constituted board of directors, will continue to manage the GCBID in the future.
 
 
 64
 Finally, even if the City does not enter into a new agreement with GCDMA, the statutory scheme requires that the activities prescribed in a BID's district plan be carried out by a "district management association," N.Y. Gen. Mun. Law § 980-m(a). Thus, unless the GCBID is dissolved, the City will be required to enter into agreement with some other not-for-profit corporation to manage the GCBID. The City states that it intends to continue the existence of the GCBID and that[w]hether or not agreement can be reached in the future with the present Board of GCDMA, which remains subject to negotiation, [the City's Department of Business Services] and the City anticipate that a new contract will be in place within a short period of time with this or another entity.
 
 
 65
 (City's Supplemental Brief at 3, 4.) Whether the manager is GCDMA or a different entity, however, the makeup of the board of a BID's managing entity is controlled by statute, see, N.Y. Gen. Mun. Law § 980-m(b), and hence any board of directors of the future manager of the GCBID, whether it be GCDMA or another entity, will be required by law to be constituted in the manner under attack here.
 
 
 66
 Accordingly, we conclude that the expiration of the Contract between the City and GCDMA has not rendered the present action moot.
 
 
 67
 B. "One Person, One Vote"
 
 
 68
 In the landmark case of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court announced that "as a basic constitutional standard, the Equal Protection Clause requires" that the seats in a state legislature "be apportioned on a population basis." Id. at 568, 84 S.Ct. 1362. This principle, generally referred to as the principle of "one person, one vote," Gray v. Sanders, 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), is based on the propositions that "people govern themselves through their elected representatives and that 'each and every citizen has an inalienable right to full and effective participation in the political processes.' " Board of Estimate v. Morris, 489 U.S. 688, 693, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) (quoting Reynolds v. Sims, 377 U.S. at 565, 84 S.Ct. 1362). The Court in Reynolds v. Sims concluded that population-based apportionment was necessary in state legislative elections to ensure that each voter had an equal vote, and hence an "equally effective voice." 377 U.S. at 565, 84 S.Ct. 1362. Thus, in such cases, "[p]opulation is, of necessity, the starting point for consideration and the controlling criterion for judgment." Id. at 567, 84 S.Ct. 1362.
 
 
 69
 This principle applies as well to elections for units of local government. See, e.g., Board of Estimate v. Morris, 489 U.S. at 692-93, 109 S.Ct. 1433; Hadley v. Junior College District, 397 U.S. 50, 54, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); Avery v. Midland County, 390 U.S. 474, 480-81, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).
 
 
 70
 While state legislatures exercise extensive power over their constituents and over the various units of local government, the States universally leave much policy and decisionmaking to their governmental subdivisions.... [I]nstitutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens.
 
 
 71
 Id. at 481, 88 S.Ct. 1114; see id. at 483, 88 S.Ct. 1114 ("virtually every American lives within what he and his neighbors regard as a unit of local government with general responsibility and power for local affairs"). If "general governmental powers" have been delegated, the fact of the delegation does not "insulate" the recipient of the power "from the standard of substantial voter equality." Board of Estimate v. Morris, 489 U.S. at 693, 109 S.Ct. 1433.
 
 
 72
 When the one-person-one-vote rule applies, deviations from that rule are subject to "close scrutiny." Kramer v. Union Free School District No. 15, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). See, e.g., Hill v. Stone, 421 U.S. 289, 298, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); Abate v. Mundt, 403 U.S. 182, 185, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971) (courts must "carefully scrutinize[ ] state interests offered to justify deviations from population equality"); Reynolds v. Sims, 377 U.S. at 562, 84 S.Ct. 1362 (scrutiny should be "careful[ ] and meticulous[ ]").
 
 
 73
 C. Special Purpose Districts Having Disproportionate Effects
 
 
 74
 Nonetheless, "nothing in the Constitution ... prevent[s] experimentation." Hadley v. Junior College District, 397 U.S. at 59, 90 S.Ct. 791 (internal quotation marks omitted); see Avery v. Midland County, 390 U.S. at 485, 88 S.Ct. 1114 (Constitution is not a "roadblock[ ] in the path of innovation, experiment, and development among units of local government").
 
 
 75
 Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions.
 
 
 76
 Sailors v. Board of Education, 387 U.S. 105, 110-11, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). The Equal Protection Clause simply establishes a "ground rule" for such innovation and experimentation: that citizens may not be denied equal voting power in elections for "units with general governmental powers over an entire geographic area." Avery v. Midland County, 390 U.S. at 485-86, 88 S.Ct. 1114. Thus, in Avery, the first Supreme Court case to apply the one-person-one-vote rule to a local government having such general power, the Court held open the possibility that the rule might not apply to
 
 
 77
 a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents.
 
 
 78
 Id. at 483-84, 88 S.Ct. 1114; see also Hadley v. Junior College District, 397 U.S. at 56, 90 S.Ct. 791 ("there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with Reynolds [v. Sims ] might not be required").
 
 
 79
 In Salyer Land Co. v. Tulare Lake Basin Water Storage District, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), the Court was presented with this question and upheld recognition of an exception to the one-person-one-vote rule with respect to a special-purpose district that assessed and benefited some constituents more than others. See also Associated Enterprises, Inc. v. Toltec Watershed Improvement District, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973) (per curiam) (same). At issue in Salyer was an entity created under California law to manage the storage of water. The affected property consisted of 193,000 acres of sparsely populated farmland, and the district's primary goal was to ensure that all property owners would have the water needed to make productive use of that farmland. The district was authorized principally to plan projects and, upon approval by the district landowners and the state, to execute projects "for the acquisition, appropriation, diversion, storage, conservation, and distribution of water." Id. at 723, 93 S.Ct. 1224 (internal quotation marks omitted). The costs of district projects were assessed against land in the district "in accordance with the benefits accruing to each [separately owned] tract." Id. at 724, 93 S.Ct. 1224. In addition, the district could "fix tolls and charges for the use of water and collect them from all persons receiving the benefit of the water or other services in proportion to the services rendered." Id. The district was managed by a board of directors chosen in weighted voting in an election open only to district landowners. See id. at 725, 93 S.Ct. 1224.
 
 
 80
 Nonlandowning residents of the district at issue in Salyer contended that the Equal Protection Clause entitled them to a vote in board elections, arguing that they "ha[d] as much interest in the operations of [the] district as landowners." Id. at 726, 93 S.Ct. 1224. The Supreme Court disagreed, holding that elections for the district board were not subject to the one-person-one-vote requirement "by reason of [the district's] special limited purpose and of the disproportionate effect of its activities on landowners as a group." Id. at 728, 93 S.Ct. 1224. Though the water storage district possessed "some typical governmental powers," the Court concluded that the district had "relatively limited authority." Id.
 
 
 81
 Its primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming.... It provides no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body.... There are no towns, shops, hospitals or other facilities designed to improve the quality of life within the district boundaries, and it does not have a fire department, police, buses, or trains.
 
 
 82
 Id. at 728-29, 93 S.Ct. 1224 (footnote omitted). With respect to the disproportionate effect of district activities on landowners, the Court noted that all costs and charges were assessed "in proportion to the benefits received" by the land, that delinquency in payment would result in a lien on the land, and that "the operations of the district[ ] primarily affect the land." Id. at 729, 93 S.Ct. 1224.
 
 
 83
 The Salyer Court thus held the district exempt from the one-person-one-vote requirement. Accordingly, it reviewed the voting restrictions to determine only whether they were "wholly irrelevant to achievement of the regulation's objectives." Id. at 730, 93 S.Ct. 1224 (internal quotation marks omitted). Under this deferential standard, the Court held that the Constitution did not require that district elections be open to nonlandowners. See id. at 731, 93 S.Ct. 1224; see also id. at 729-30, 93 S.Ct. 1224 ("it is quite understandable that the statutory framework for election of directors of the [district] focuses on the land benefited, rather than on people as such").
 
 
 84
 Four years later, the Court summarized the exception it had created in Salyer, stating that "the electorate of a special-purpose unit of government ... may be apportioned to give greater influence to the constituent groups found to be most affected by the governmental unit's functions." Town of Lockport v. Citizens for Community Action at the Local Level, Inc., 430 U.S. 259, 266, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977). And in Ball v. James, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981), the Court was again presented with a governmental unit to which it found the exception applicable. The unit whose voting scheme was challenged was again a water storage district, but one whose functions were "more diverse and affect[ed] far more people" than the district in Salyer, for it included "almost half the population of the State [of Arizona], including large parts of Phoenix and other cities." Ball, 451 U.S. at 365, 101 S.Ct. 1811. The district was a "nominal public entit[y]," id. at 368, 101 S.Ct. 1811, so designated in order to permit it to raise money inexpensively through the issuance of public bonds; it also "exercised its statutory power to generate and sell electric power," id. at 365, 101 S.Ct. 1811. The Court nonetheless concluded that the district was "essentially [a] business enterprise[ ]," id. at 368, 101 S.Ct. 1811, that had the special limited purpose of "stor[ing], conserv[ing], and deliver[ing] water," id. at 369, 101 S.Ct. 1811, and was not a general governmental body in light of the limited scope of its purpose and powers:
 
 
 85
 [T]he District simply does not exercise the sort of governmental powers that invoke the strict demands of Reynolds [v. Sims ]. The District cannot impose ad valorem property taxes or sales taxes. It cannot enact any laws governing the conduct of citizens, nor does it administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services.
 
 
 86
 Ball, 451 U.S. at 366, 101 S.Ct. 1811.
 
 
 87
 The Court also concluded that the district's functions bore a "disproportionate relationship" to those who owned land within the district, id. at 370, 101 S.Ct. 1811, pointing out that only landowners bore the direct economic burdens of the district's activities, see id., and stating that, with respect to benefits, "[t]he constitutionally relevant fact is that all water delivered by the ... District, like the water delivered by the [district in Salyer ], is distributed according to land ownership," id. at 367, 101 S.Ct. 1811; see also id. n. 13. Following the course laid out in Salyer, the Court thus reviewed the district's voting scheme deferentially and upheld it as "bear[ing] a reasonable relationship to its statutory objectives." Ball, 451 U.S. at 371, 101 S.Ct. 1811. The Court noted that the creation of the district
 
 
 88
 might well have never occurred had not the subscribing landowners been assured a special voice in the conduct of the District's business. Therefore, as in Salyer, the State could rationally limit the vote to landowners. Moreover, Arizona could rationally make the weight of their vote dependent upon the number of acres they own, since that number reasonably reflects the relative risks they incurred as landowners and the distribution of the benefits and the burdens of the District's water operations.
 
 
 89
 Id.; see also Salyer, 410 U.S. at 731, 93 S.Ct. 1224.
 
 
 90
 Thus, the general framework established by the Supreme Court is that elective bodies performing governmental functions that "are general enough and have sufficient impact throughout the district," Board of Estimate v. Morris, 489 U.S. at 696, 109 S.Ct. 1433 (internal quotation marks omitted), i.e., entities with " 'normal governmental' authority," Salyer, 410 U.S. at 729, 93 S.Ct. 1224, are subject to the one-person-one-vote requirement, but that entities with a "special limited purpose and ... [a] disproportionate effect" on certain constituents, id. at 728, 93 S.Ct. 1224, are exempt from that requirement, and may use voting schemes that need only be reasonably related to their purposes.
 
 
 91
 Because "governmental activities 'cannot easily be classified in ... neat categories,' " Hadley v. Junior College District, 397 U.S. at 56, 90 S.Ct. 791 (quoting Avery v. Midland County, 390 U.S. at 482, 88 S.Ct. 1114), application of this test has been difficult, see Pittman v. Chicago Board of Education, 64 F.3d 1098, 1102 (7th Cir.1995) ("The line between a general-purpose governmental body and a special-purpose ... one is wavering and indistinct."), cert. denied, 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996). In the cases analyzing whether particular elective entities were subject to the one-person-one-vote rule, various facets of the powers exercised by those entities have been emphasized. For example, this Court has concluded that that rule applied to elections for a regional school board that had "the exclusive power to initiate and propose" expenditures and borrowing. See Baker v. Regional High School District No. 5, 520 F.2d 799, 802 (2d Cir.), cert. denied, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975). The Tenth Circuit has held the one-person-one-vote rule applicable to a state's board of agriculture principally because of "the breadth of oversight exercised" by the board, Hellebust v. Brownback, 42 F.3d 1331, 1334 (10th Cir.1994), while the Seventh Circuit has held the rule not applicable to a local school council principally because the council lacked "the power to tax," Pittman v. Chicago Board of Education, 64 F.3d at 1102. Each case implicates a different set of concerns because, as the Supreme Court has long recognized, the "science" of government
 
 
 92
 has but few fixed principles, and practically consists in little more than the exercise of a sound discretion, applied to the exigencies of the state as they arise. It is the science of experiment.
 
 
 93
 Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 226, 5 L.Ed. 242 (1821); see Sailors v. Board of Education, 387 U.S. at 109, 87 S.Ct. 1549.
 
 
 94
 Although the only cases in which the Supreme Court has approved weighted voting for a special purpose district involved water conservation, nothing in those cases suggests that the exception to the one-person-one-vote principle is limited to water conservation projects. Indeed, the seminal discussion mentioned constitutional " 'flexibility [for] municipal arrangements to meet changing urban conditions,' " Hadley v. Junior College District, 397 U.S. at 59, 90 S.Ct. 791 (quoting Sailors v. Board of Education, 387 U.S. at 110-11, 87 S.Ct. 1549 (1967)) (emphasis ours), and in Ball, where some 40% of the water managed by the district was delivered to nonagricultural land, the Court noted that "the distinction between agricultural and urban land is of no special constitutional significance in this context," 451 U.S. at 367, 101 S.Ct. 1811.
 
 
 95
 Given the typically greater complexity and novelty of the problems facing urban areas, the need for governmental creativity to address those problems is to be expected in urban areas more frequently. The mere designation of an elective body to perform a large number of functions does not trigger the one-person-one-vote requirement. As the Ball Court noted,
 
 
 96
 [n]othing in the Avery, Hadley, or Salyer cases suggests that the volume of business or the breadth of economic effect of a venture undertaken by a government entity as an incident of its narrow and primary governmental public function can, of its own weight, subject the entity to the oneperson, one-vote requirements of the Reynolds case.
 
 
 97
 451 U.S. at 370, 101 S.Ct. 1811.
 
 D. The Grand Central Business District
 
 98
 With these principles in mind, we consider the purpose of the GCBID, the functions, responsibilities, and powers of GCDMA, and the impacts of GCDMA activities on those owning or residing on property within the district. For the reasons that follow, we conclude that although a few of GCDMA's functions are of the type that the City also performs, GCDMA's responsibilities and powers are so circumscribed that GCDMA cannot be said to exercise the core powers of sovereignty typical of a general purpose governmental body. We also conclude that both the burdens and the benefits of GCDMA activities disproportionately impact property owners, and that the voting system for GCDMA's Board is reasonably related to the goals warranting the establishment of a BID.
 
 1. The GCBID's Limited Purpose
 
 99
 As discussed in Part I.A. above, the purpose of the Grand Central BID is the promotion of business. Its geographic area is a swath of midtown Manhattan devoted overwhelmingly to commercial use (the ratio of commercial space to residential space is more than 70 to 1), and its goal is to attract and keep businesses by assisting property owners to achieve the remunerative use of that commercial space.
 
 
 100
 The greater diversity of the projects undertaken by GCDMA, as compared to the projects in Salyer, is a result of the substantial differences in the nature and use of the property to be benefited. While Salyer involved 193,000 acres of rural land devoted almost exclusively to agricultural use, the GCBID encompasses all or parts of 75 city blocks, in which the businesses are diverse and the premises concentrated. While owners of agricultural land often have no greater concern than their need for adequate water supplies, see, e.g., Salyer, 410 U.S. at 721-22, 93 S.Ct. 1224, the problems of property owners in the GCBID, which includes some of the most heavily developed land in the nation, are necessarily more complex, involving the need to maintain a lively, safe, and attractive commercial center through which millions of people pass daily. The greater complexity of the latter problems leads to greater complexity of the functions of the managing agent in devising solutions and coordinating programs.
 
 
 101
 Yet the complexity of the projects aimed at promoting business in the GCBID should not obscure the fact that the promotion of business is a limited purpose. The GCBID, like the water districts at issue in Salyer and Ball, is not concerned with the provision of general public services such as schools, housing, hospitals, jails, firefighting, transportation, utilities, or zoning. And although, as discussed in Part II.D.3. below, some of GCDMA's functions are of a public welfare nature, its functions as a matter of law cannot supplant the fundamental obligations of the City.
 
 2. GCDMA's Lack of Sovereign Power
 
 102
 Not only does the purpose of the Grand Central BID not encompass many traditional governmental functions, the GCDMA lacks the powers normally enjoyed by a governmental body. GCDMA does not have the power, for example, to impose income taxes or sales taxes. Nor, indeed, does GCDMA levy or collect the assessments needed to fund the GCBID. Those functions are performed by the City, which holds the moneys until they are disbursed--either to GCDMA, or perhaps to another entity if the City is displeased with GCDMA's performance and elects to contract with a new manager, see Parts I.A.3. and II.A. above and II.D.4. below.
 
 
 103
 Further, GCDMA has no authority to enact or enforce any laws governing the conduct of persons present in the district. It cannot, for example, make or enforce any environmental or other sanitation regulations. Although it employs workers who bag trash, remove graffiti, and engage in other area-beautification projects, it performs no inspections in matters of health and safety, and neither the Act nor the District Plan gives it any power to issue citations for violations of City building or zoning codes.
 
 
 104
 And although GCDMA employs security guards, its guards have no authority to perform typical law enforcement functions. The guards are not authorized by the Act or the District Plan to, for example, make arrests, conduct investigations, obtain warrants for searches, or detain suspects. Except for specially licensed supervisors, GCDMA's security personnel are not armed. Their tools are communications equipment tying them into the City's police network to enable them to summon law enforcement personnel from the City police department.
 
 
 105
 In short, GCDMA itself cannot meaningfully alter the conduct of persons present in the district.
 
 3. GCDMA's Limited Role and Responsibility
 
 106
 Plaintiffs contend, however, that application of the one-person-one-vote principle is warranted because of GCDMA's functions in the area of security, sanitation, and social services. While these are types of services that are often provided by local governments, we conclude that the fact that GCDMA also provides them is insufficient to subject it to the one-person-one-vote requirement because (a) by law GCDMA's responsibility for these functions is at most secondary to that of the City, (b) GCDMA's activities in these areas are quantitatively dwarfed by those of the City, and (c) the services performed by GCDMA are qualitatively different from core municipal functions.
 
 
 107
 As a matter of law GCDMA does not have primary responsibility for providing security, sanitation, or social services within the district. The Act requires that the
 
 
 108
 [s]ervices for which district property owners are charged pursuant to the [district] plan must be in addition to or an enhancement of those provided by the municipality prior to the establishment of the district.
 
 
 109
 N.Y. Gen. Mun. Law § 980-j(a) (emphasis added). Thus, the City itself has--and by law must retain--the primary responsibility for providing security, sanitation, and social services in the GCBID.
 
 
 110
 Moreover, the City's provision of these services is far more extensive than the limited activities of GCDMA. For example, while GCDMA employs some 63 security guards, most of them unarmed, the District is served primarily by three City police precincts which it overlaps. Further, as discussed above, the GCDMA security guards do not act as policemen. Although they patrol the district in the expectation that their visible presence will deter the incidence of serious crime, if law enforcement is needed, GCDMA security personnel call in the City police.
 
 
 111
 As to social services, while GCDMA contributes to the funding of a single outreach facility for homeless persons, the City has an entire Department devoted to assisting the homeless. Indeed, even if GCDMA had a more extensive role in the outreach facility and even if the facility provided the homeless with more extensive services, such as temporary housing, those facts alone would not transform GCDMA into a general governmental body, any more than it makes public bodies out of religious or other charitable organizations that offer such services.
 
 
 112
 Further, most of the so-called "sanitation" activities in which GCDMA engages are not focused on matters of public health. For example, GCDMA sanitation workers bag loose trash, but they do not cart it away. It remains the responsibility of the City's Department of Sanitation to perform the ordinary municipal refuse removal service. Rather, the physical Improvements, such as installing better street lights and more attractive trash bins and illuminating Grand Central Terminal at night, as well as many of the Services, such as removing graffiti and old posters, cleaning street signs, and assisting merchants to design and install new signs and facades, are simply efforts to improve the physical appearance of the district. We cannot conclude that these activities reflect the exercise of general governmental authority.
 
 
 113
 Other GCDMA activities, such as the operation of information booths for tourists, the planned opening of a restaurant near Grand Central Terminal, and the sponsorship of public events are also nothing more than efforts to make the district more attractive to tourists and other consumers. None of these activities are indicative of general governmental authority.
 
 4. The City's Control Over GCDMA
 
 114
 Finally, even as to the capital improvement functions to be performed, the Act does not vest any power in GCDMA. Rather, as described in Part I.A.1. above, the power resides in the City, for the Act provides that after the establishment of a BID, "the legislative body shall have authority" to make the improvements to BID-owned or -leased property and to provide the additional services to "restore or promote business activity in the district," N.Y. Gen. Mun. Law § 980-c (emphasis added). Thus, even the activities that GCDMA performs are subject to close City control. For example, under the Act, the total annual amount to be spent on improvements, maintenance, and operation must be set out in the District Plan, and the Plan limits the amount and type of expenditures GCDMA may make. The Plan cannot be implemented unless it is approved by the City Council; nor can the total annual amount to be expended be increased unless the City amends the District Plan. Thus, the City has control over the maximum size of GCDMA's budget and the scope of its activities.
 
 
 115
 Further, since the annual rate of the assessment in each geographic section of the BID is simply the portion of GCDMA's annual budget for that section that is attributable to each square foot of nonexempt property in that section, the City, by virtue of its control over the upper limit of GCDMA's budget, also has control over the maximum rate of the assessment imposed against BID property. GCDMA cannot increase the rate of the assessment above the maximum rate which is set by the City.
 
 
 116
 It is true that once the City approves a maximum annual budget amount for GCDMA, GCDMA may continue spending at that level in each succeeding year, and property will continue being assessed at the corresponding rate in each succeeding year, with no requirement of continued City approval. But that fact does not subject GCDMA elections to the one-person-one-vote rule, for even "the power to levy and collect special assessments ... does not create ... general governmental authority." Ball, 451 U.S. at 366 n. 11, 101 S.Ct. 1811.
 
 
 117
 Moreover, the City retains significant control over the disposition of the money collected. The assessments collected are under "custody and control of, and are directly expend[ed]" by the City, not GCDMA. N.Y. Comptroller Op. 94-22, at 40; see id. at 39-40 (BID assessments are "municipal moneys to be held in the custody of, and accounted for, by ... the municipality"). Plaintiffs' contention that this is a purely formal arrangement and that the City "has no discretion over whether or how much it must turn over to the GCDMA" (Plaintiffs' Brief on Appeal at 17), is based on a misreading of the Act. The only statutory requirement imposed upon the City with respect to the disposition of the funds is that they may not be used "for any purposes other than those set forth in the district plan." N.Y. Gen. Mun. Law § 980-l (a) (emphasis added). There is no unqualified requirement that the money be given to GCDMA for the fulfillment of those purposes. It was of course anticipated that GCDMA would adequately carry out its functions; but upon determining that GCDMA has not satisfactorily performed its duties under the Contract, the City has "the right to withhold any [assessments]" from GCDMA. (Contract § 1.05.) Thus, although BID property is assessed each year at a rate that the City cannot reduce--unless it abolishes the BID--the City controls the disbursement of the money.
 
 
 118
 In addition, the City has considerable supervisory authority over GCDMA's expenditure of whatever money GCDMA does receive from the City. GCDMA was required to submit to the City annually a detailed explanation of its past year's expenditures and a planned budget for the upcoming year. It is also required to submit to the City design plans and specifications for all proposed Improvements and must submit a schedule for their completion. The parties further agree that GCDMA has no independent authority to make physical improvements within the BID without the approval of the relevant City agencies. And while GCDMA has somewhat greater latitude in its provision of the Services, under the Contract its performance of the Services is subject to the review and reasonable direction and control of the Commissioner, who has the right to "inspect" GCDMA's Services and, if he finds them unsatisfactory, to order that they be properly performed. If GCDMA does not comply with the order, the City may withhold funds from GCDMA and have someone other than GCDMA perform the Services. Finally, we note that the City had the right, if displeased with GCDMA's performance, to refuse to renew the Contract--a right it has now exercised.
 
 
 119
 In sum, in light of (a) the BID's limited goal of improving the area for business, (b) the fact that GCDMA is not the primary provider of the limited security, sanitation, or social services it performs, and (c) the City's control over GCDMA's performance with respect to the functions it performs, we conclude that here, as in Salyer and Ball, the district's manager has relatively limited authority and does not exercise the sort of governmental powers that normally triggers the one-person-one-vote principle.
 
 5. Proportionality of Voting and Effect
 
 120
 We further conclude that the establishment and operation of the GCBID has a substantially greater effect on property owners than on nonowning residents. Most significantly, the principal burden imposed by the GCBID--the mandatory assessment--falls directly on property owners and only property owners. The Act requires that "the expenses of a [BID] ... be imposed upon benefited real property, in proportion to the benefit received by such property." N.Y. Gen. Mun. Law § 980-a(b)(8). Pursuant to the District Plan, property owners pay an assessment that constitutes the principal source of funding for GCDMA's activities. Each property owner's bill for that assessment is based on the number of square feet of district property that he owns.
 
 
 121
 District residents, on the other hand, are not, unless they own property, subject to the assessment. Residents pay no additional taxes as a result of living within the GCBID. Of course some property owners who lease their property to others may seek to pass all or part of the cost of the assessment to their tenants--whether commercial or residential--by raising rents. It is also possible, however, that such rent increases will be limited by factors such as rental market conditions, the terms of individual leases, or City and State rent control and rent stabilization regulations. To be sure, plaintiffs and their fellow shareholders in the cooperative association that owns their building seem likely to be indirectly burdened by the assessment in proportion to their interests in the cooperative, although the amount of their burden may be reduced if their building has commercial tenants who are made to bear part of the expense. Nonetheless, the possibility that part of the cost of an assessment would be passed on to resident nonlandowners existed as well in the water district cases and indeed inheres in any case in which an assessed landowner has a tenant. Whether or not part of the cost is passed on to any tenant, "there is no way that the economic burdens of district operations can fall on residents qua residents." Salyer, 410 U.S. at 729, 93 S.Ct. 1224. We conclude that the burdens of the GCBID assessments fall disproportionately on property owners.
 
 
 122
 We note parenthetically that plaintiffs can participate in the selection of two classes of GCDMA's directors. As resident nonowners of property, they have a voice in the selection of the Class C director. And as shareholders of their cooperative which is a property owner, plaintiffs have a voice in how their cooperative exercises its Class A voting power. The latter voice is directly proportional to the size of whatever indirect economic burden plaintiffs may bear.
 
 
 123
 With respect to the benefits of GCDMA's activities, we note that since the money raised by the assessments against district property must be used for the specific business "purposes ... set forth in the [D]istrict [P]lan," that money may not permissibly be used for the general benefit of the residents in the district. N.Y. Gen. Mun. Law § 980-l (a). Nonetheless, certain GCDMA activities, such as the improvement of security and aesthetics within the district, will provide some benefit to district residents as well as district businesses; but
 
 
 124
 [t]he Salyer opinion did not say that the selected class of voters for a special public entity must be the only parties at all affected by the operations of the entity.... Rather, the question was whether the effect of the entity's operations on them was disproportionately greater than the effect on those seeking the vote.
 
 
 125
 Ball, 451 U.S. at 371, 101 S.Ct. 1811. As indicated above, the benefits of GCDMA's security and social service functions are rather limited. Its "beautification" Improvements may also provide aesthetic benefits to nonowner residents as well as to the owners of commercial property. The principal economic benefit from GCDMA's activities, however, plainly accrues to the property owners, who will enjoy an increase in the value of their property.
 
 
 126
 In sum, we conclude that the operation of the GCBID affects property owners and nonowning residents disproportionately.
 
 6. Reasonable Relationship
 
 127
 Since the GCBID is a special-purpose district that affects property owners disproportionately, the Constitution requires only that the weighted voting system for electing GCDMA's Board bear a reasonable relationship to the purposes of the GCBID. Plaintiffs have made no attempt to argue that GCDMA's weighted voting system lacks such a reasonable relationship, and we think such a relationship is obvious. The need for cooperative action among property owners is clear. Projects such as the Improvements to land in the district, the sweeping of streets, and the provision of additional security personnel are projects that redound to the benefit of many property owners; but for that very reason, these are projects that no owner would likely undertake individually. The GCBID allows property owners to pool their resources to accomplish mutually beneficial projects to increase the attractiveness of district property for commercial purposes.
 
 
 128
 In Ball, the Supreme Court found that weighted voting had the requisite reasonable relationship by virtue of the fact that the creation of the district "might well have never occurred had not the subscribing landowners been assured a special voice in the conduct of the District's business." 451 U.S. at 371, 101 S.Ct. 1811. Here too, if a sufficient number of property owners in the district had objected, they could have prevented the establishment of the GCBID. See N.Y. Gen. Mun. Law §§ 980-e(b), 980-f(b)(1). Indeed, if a sufficient number object in the future, the GCBID will be dissolved. See id. § 980-n(a). Since only property owners are assessed to fund GCDMA's activities, the State legislature could reasonably have concluded that property owners, unless given principal control over how the money is spent, would not have consented to having their property subject to the assessment. The guarantee that property owners will have majority representation on the Board is thus reasonably related to the goal of promoting commercial activity in the GCBID.
 
 CONCLUSION
 
 129
 For the foregoing reasons, we conclude that the Grand Central BID is a district that exists for a special limited purpose, that GCDMA's activities have a disproportionate effect on property owners, and that GCDMA has no primary responsibilities or general powers typical of a governmental entity. Accordingly, we conclude that the GCBID falls within the exception to the one-person-one-vote requirement. Since the Act's guarantee of majority Board representation to property owners has a reasonable relationship to the purpose of the BID, we conclude that the weighted voting system for electing GCDMA's Board does not violate the Equal Protection Clause.
 
 
 130
 We have considered all of plaintiffs' arguments on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.
 
 WEINSTEIN, District Judge, dissenting:
 
 131
 TABLE OF CONTENTS
I. INTRODUCTION...................................................... 109
II. FACTS............................................................. 110
 A. Nature of Business Improvement Districts (BIDs).............. 110
 B. Grand Central BID............................................ 110
 C. Grand Central District Management Association................ 111
 1. Funding................................................. 111
 2. Scope of Permissible Activities......................... 112
 3. Services Performed...................................... 113
 a. Security........................................... 113
 b. Sanitation......................................... 113
 c. Capital Improvements............................... 113
 d. Social Services.................................... 114
 e. Transportation, Aesthetics, Visitor
 Services, Public Events, and Promotion............. 114
 4. Discretion.............................................. 114
 5. Lack of City Oversight.................................. 115
 6. Election Procedures..................................... 116
III. LAW............................................................... 117
 A. American Suffrage Rights..................................... 117
 B. The One Person, One Vote Principle........................... 119
IV. APPLICATION OF ONE PERSON, ONE VOTE REQUIREMENT TO
 THE GRAND CENTRAL BID............................................. 121
 A. Impact On Residents of the BID............................... 122
 1. Services................................................ 122
 2. Compared to Powers in Hadley............................ 123
 3. Effect on Nonproperty Owners............................ 123
 B. Discretion In Running BID.................................... 124
 C. Salyer Exception to the One Person, One Vote
 Principle Does Not Apply to the Grand Central BID............ 125
 1. Not A "Limited Purpose" District........................ 126
 2. Does Not "Disproportionately Affect" a
 Limited Number of Persons............................... 127
 3. Quasi"Public Nature..................................... 127
V. CITY'S PURPORTED OVERSIGHT NO JUSTIFICATION FOR
 DISCRIMINATION AGAINST NONPROPERTY OWNERS......................... 128
 A. Lack of City Control......................................... 128
 B. Discrimination in Provision of Municipal and
 Governmental Services........................................ 129
 C. Real Estate Owners' and Commercial Interests'
 Power........................................................ 130
VI. THE DISENFRANCHISEMENT OF URBAN POPULATION........................ 131
VII. UNCONSTITUTIONALITY ON FACE....................................... 132
VIII. SUMMARY JUDGMENT INAPPROPRIATE.................................... 133
IX. CONCLUSION........................................................ 133
 
 I. INTRODUCTION
 
 132
 If the majority is correct that the few recent Supreme Court water district cases predict a limitation on the right to equality of the vote in controlling municipal government, a dissent is unjustified. But I cannot believe that the vast surging tide towards full voting rights that has characterized this nation's history for the last two centuries is now ebbing, that the shining principle of one person, one vote has dimmed, or that the radical attenuation of the power of the ballot in mini-municipalities known as Business Improvement Districts can be constitutionally countenanced. Granting a more powerful vote to some because they own real property constitutes such a derogation from constitutional principles, such a denigration of equality of political rights, such a diminution in the practical political power of citizens, that I must respectfully dissent.
 
 II. FACTS
 
 133
 A. Nature of Business Improvement Districts (BIDs)
 
 
 134
 Business Improvement Districts (BIDs) are quasi-public institutions lately being used by many municipalities to increase the level of services provided in particular geographic areas of America's cities. They are established pursuant to public statute and typically are funded through an assessment on real property within the BIDs' territories. These levies are collected by public officials and disbursed to the BIDs so that certain areas within the city may receive additional services over and above those provided by the municipality in the city at large. BIDs are generally responsible for determining how the expenditure of these public funds will best benefit the businesses, residents, and others within their territories. New York City's BIDs enjoy especially broad grants of authority and exercise wide latitude in carrying out their functions.
 
 
 135
 One of the theories behind the establishment of a BID is that the residents and property holders within these local units will be more willing to pay increased taxes if they are assured that the assessments will be utilized for the direct benefit of the immediate area in which they live or own property. See Richard Briffault, The Rise of Sublocal Structures in Urban Governance, 82 Minn. L.Rev. 503, 532 (1997); Mark S. Davies, Business Improvement Districts, 52 Wash. U.J. Urb. & Contemp. L. 187, 202-03 (1997). Much of the strength of this theory rests on the notion that those within the BID's territory, by participating in the BID's governing process, will enjoy an increased opportunity to influence how these extra taxes will affect and shape their communities.
 
 
 136
 While the political and economic merits of Business Improvement Districts may be debated, one fact about BIDs is beyond question: more and more municipalities have found it expedient to allow BIDs to provide a wide range of important governmental services. As of 1996 there were approximately forty states with statutes providing for the establishment of BIDs or BID like entities. See David J. Kennedy, Restraining the Power of Business Improvement Districts, 15 Yale L. & Pol'y Rev. 283, 290 n. 61 (1996). According to recent estimates there are approximately 1,000 BIDs in the United States, extending from large metropolises such as Philadelphia, Los Angeles and New York to small towns such as Bellingham, Washington, and Somerville, New Jersey. See John A. Barnes, "Business Improvement" Districts: Doing What Government Doesn't, Investor's Bus. Daily, Sept. 6, 1995, at B1; see also Richard Briffault, The Rise of Sublocal Structures in Urban Governance, 82 Minn. L.Rev. 503, 518 n. 72 (1997) (citing 1996 study which estimates between 1,000 and 2,000 BIDs in North America). In New York City alone there are forty BIDs. See Thomas J. Lueck, Business District Vows to Fight City's Order to Shut It Down, N.Y. Times, July 31, 1998, at B1.
 
 B. Grand Central BID
 
 137
 The Grand Central Business Improvement District is one of the largest, best funded, and most controversial Business Improvement Districts in New York City. It was established in 1988 pursuant to New York General Municipal Law sections 980-d through 980-h and New York City Administrative Code sections 25-405 through 25-409. The geographic boundaries of the Grand Central Business Improvement District were expanded in 1995 and currently cover a seventy five block area in midtown Manhattan. See District Plan As Amended For The Grand Central Business Improvement District In The City of New York Borough of Manhattan § II.A. (1994) (hereinafter 1994 District Plan ). An indication of the size of the Grand Central BID is that it covers a tract equivalent to at least the size of downtown Los Angeles. See Alan S. Oser, Banding Together for Local Betterment, N.Y. Times, Feb. 10, 1991, § 10, at 5 (reporting that, even before it was expanded in 1995, the BID covered an area the size of downtown Los Angeles). While the area is primarily utilized for commercial offices, hotels, and retail stores, there are approximately 897,000 square feet of residential space scattered throughout the district. See 1994 District Plan § II.A. Approximately 930 residents, the majority of whom are tenants or co-op shareholders, live within the district's boundaries. See 1994 District Plan § II.D. (finding that "most of [the residents] occupy rented apartments of one bedroom or less").
 
 
 138
 C. Grand Central District Management Association
 
 
 139
 New York law requires that the activities of the Grand Central Business Improvement District be administered by a district management association. See N.Y. Gen. Mun. Law § 980-m(b) (McKinney Supp.1998); N.Y. City Admin. Code § 25-414(b) (1990). For this reason the Grand Central District Management Association (GCDMA) was formed to carry out the policy making authority of the Grand Central Business District.
 
 1. Funding
 
 140
 One of the GCDMA's most important responsibilities is to formulate its own budget. Its budget dictates the level at which real property within the district is assessed by the City. For the past ten years the City of New York has levied an assessment on all non-exempt real property within the district and disbursed the full proceeds from this property tax to the GCDMA. The assessments are collected by the City at the same time and in the same manner as general municipal real estate taxes. See N.Y. Gen. Mun. Law § 980-j(b) (McKinney Supp.1998). Anyone failing to pay these assessments is subject to the same penalties incurred for failure to pay other city taxes, including forfeiture of real property.
 
 
 141
 The rate of the assessments is calculated to produce a total income which will meet the GCDMA's budget. As the GCDMA has increased its budget, the rate of the assessments has risen. The GCDMA may continue to raise its budget in future years provided that the assessments do not surpass 5% of the total taxes levied by the city on the district's property. See 1994 District Plan § V.B.
 
 
 142
 The GCDMA is not required to seek the approval of the City Council for its budgets provided that the total budget amount is equal to or less than that of previous years, although it must make its budget available for review by the Department of Business Services (DBS). While the City Council is free to reject an increase in the total budget amount, neither the City Council nor the DBS appears to have the right under the contract or the District Plan to veto or amend particular provisions of the budget. The District Plan provides the GCDMA with explicit authority to revise its own budget itemizations. See 1994 District Plan § VI.C.4.
 
 
 143
 Assuming that the GCDMA complies with its contractual obligations, the City may not withhold any of the assessments it collects on the GCDMA's behalf, nor may it seek to reduce the level of assessments levied within the district. The GCDMA is obligated every year to make its budget available for review by the Department of Business Services but the DBS apparently lacks the authority to guide or supervise the GCDMA's budget making process. Because the DBS seems never to have attempted to oversee a BID's budget, it is difficult to say what rights it may exercise with respect to future fiscal plans of this BID.
 
 
 144
 In addition to real property assessments, the GCDMA has raised money through the issuance of bonds. Pursuant to New York state and city law, see N.Y. Gen. Mun. Law § 980-j(c); N.Y. City Admin. Code § 25-411(c) (1990), the GCDMA has issued bonds totaling some $32 million dollars; interest payable on the bonds is tax exempt under the income tax laws of the federal, state, and city government. See Official Statement, Grand Central District Management Association, Inc., Capital Improvement Refunding Bonds, Series 1994, at 32-33 (January 24, 1994) (Joint Appendix 709, 743-44) (hereinafter Official Bond Statement ). These bonds are charged against the City's constitutional debt limit, reducing the amount of money that the City can raise through its own future bond issues. See N.Y. Gen. Mun. Law § 980-k(a) (McKinney Supp.1998); N.Y. City Admin. Code § 25-412(a) (1990). The City of New York has curtailed the ability of BIDs such as the GCDMA to issue new bonds in order to protect its own ability to borrow money in the future and out of an apprehension that the City will be held legally responsible for satisfying the GCDMA's debt should the BID default on its financial obligations. See Clifford J. Levy, City Prohibits Borrowing By Improvement Districts, N.Y. Times, Sept. 14, 1996, at 22 (reporting mayor's decision to deny BID requests for new bonds); Clifford J. Levy, Mayor Seeks Stricter Curbs on Business Improvement Districts, N.Y. Times, Sept. 5, 1996, at B5 (reporting statement of Deputy Mayor for Economic Development that, "if one of [the BIDs] goes into debt and goes belly up, the city is going to be the one left holding the bag").
 
 
 145
 The bulk of the GCDMA's budget is funded through taxes collected by the City from real property owners within the BID. During the fiscal year ending in June 1995 (the last complete year of records contained in the joint appendix), the GCDMA's combined income was slightly over $12 million. See Combined Financial Statements, Grand Central Partnership, Inc., Grand Central District Management Association, Inc., Grand Central Partnership Social Services Corp. (June 30, 1995) (Joint Appendix 495, 498) (hereinafter 1995 Financial Statement ). Of this total, approximately $8.7 million was provided by the City in the form of assessments, grants, and contracts. See 1995 Financial Statement. The portion of the GCDMA's budget that was derived directly from these public funds or from bonds amounted to approximately 84% of total revenue. See id. In fiscal 1995 the GCDMA supplemented its City funds with $600,000 in grants, contributions and private contracts, and $1.2 million from service fees. Id.
 
 2. Scope of Permissible Activities
 
 146
 With its sizable budget the GCDMA is authorized to perform a comprehensive array of public services and functions. In essence there is no substantive limitation upon the scope of its permissible activities. The District Plan provides that the GCDMA's activities, "may include any services required for the enjoyment and protection of the public and the promotion and enhancement of the District...." 1994 District Plan § III.A.
 
 
 147
 The contract between the City and the GCDMA contains a sweeping grant of authority. It specifically authorizes the GCDMA to provide security, sanitation, tourist orientation, social services for homeless persons, maintenance, and the promotion of public events. See Contract between the City of New York, Department of Business Services and Grand Central District Management Association, Inc. 5-8 (July 30, 1993) (Joint Appendix 576, 581-84) (hereinafter Contract ). In addition, the contract stipulates that the GCDMA may perform "any other activities or services and purchases ... which the [GCDMA] determines will enhance the safety, convenience, cleanliness, attractiveness or usefulness of the District...." Id. at 8.
 
 
 148
 Section 980-c of New York General Municipal Law provides an illustrative list of statutorily approved BID activities:
 
 
 149
 (a) provide for district improvements located on or within municipally or district owned or leased property which will restore or promote business activity in the district: (1) construction and installation of landscaping, planting, and park areas; (2) construction of lighting and heating facilities; (3) construction of physically aesthetic and decorative safety fixtures, equipment and facilities; (4) construction of improvements to enhance security of persons and property within the district; (5) construction of pedestrian overpasses and underpasses and connections between buildings; (6) closing, opening, widening or narrowing of existing streets; (7) construction of ramps, sidewalks, plazas, and pedestrian malls; (8) rehabilitation or removal of existing structures as required; (9) removal and relocation of utilities and vaults as required; (10) construction of parking lot and parking garage facilities; and (11) construction of fixtures, equipment, facilities and appurtenances as may enhance the movement, convenience and enjoyment of the public and be of economic benefit to surrounding properties such as: bus stop shelters; benches and street furniture; booths, kiosks, display cases, and exhibits; signs; receptacles; canopies; pedestrian shelters and fountains.
 
 
 150
 (b) provide for the operation and maintenance of any district improvement;
 
 
 151
 (c) provide for additional maintenance or other additional services required for the enjoyment and protection of the public and the promotion and enhancement of the district whether or not in conjunction with improvements authorized by this section, including: (1) enhanced sanitation services; (2) services promoting and advertising activities within the district; (3) marketing education for businesses within the district; (4) decorations and lighting for seasonal and holiday purposes; and (5) services to enhance the security of persons and property within the district.
 
 
 152
 (d) enter into contracts to provide for the construction of accessibility improvements adjacent to public areas by businesses within the district which will increase access from public areas to such businesses for persons with disabilities and the general public and assist businesses in meeting requirements for removal of architectural barriers in existing facilities, pursuant to the Americans with disabilities act of 1990, as amended (P.L. 101-336).
 
 
 153
 N.Y. Gen. Mun. Law § 980-c (McKinney Supp.1998).
 
 3. Services Performed
 
 154
 Pursuant to its broad scope of authority, the GCDMA performs a variety of functions within the district. Of the approximately $12 million dollars expended in fiscal year 1994-1995 it spent $4,157,474 on social services; $2,947,459 on capital projects; $1,498,457 on sanitation services; $1,312,408 on security; $426,683 on public events; $245,794 on visitor services; $207,690 on taxi stands; $150,308 on special maintenance; $139,618 on retail improvements; and $60,362 on promotion. See 1995 Financial Statement. To perform these services the GCDMA employs over 200 employees. See Minutes, Joint Meeting of the Directors of Grand Central District Management Association, Inc. and Directors of Grand Central Partnership, Inc. 3 (November 10, 1994) (statement of Mr. Biederman, president of BID) (Joint Appendix 220, 222).
 
 
 155
 a. Security
 
 
 156
 The GCDMA employs more than sixty security guards to patrol the seventy five blocks of the district. Some of them have carried arms on patrols; a number have possessed "peace officer" status. Under New York law those with peace officer status may make warrantless arrests and searches and use deadly force in arresting or in preventing an escape. See N.Y.Crim. Proc. Law § 2.20(a),(b),(c) (McKinney 1992).
 
 
 157
 The security force is organized to coordinate with the New York Police Department in order to reduce the incidence of serious crime and to ensure compliance with those City regulations controlling vending, sidewalk obstructions, noise generation, and air pollution. See 1994 District Plan § III.A.1. To facilitate cooperation and coordination between these two forces the GCDMA's guards have been directly tied into the NYPD's communications network. See id. (referring to "Operation Interlock"). GCDMA security guards also share a substation with the NYPD and hold monthly meetings with the police to discuss crime trends. See Heather Barr, More Like Disneyland: State Action, 42 U.S.C. § 1983, and Business Improvement Districts in New York, 28 Colum. Hum. Rts. L.Rev. 393, 404 & n. 52 (1997).
 
 
 158
 b. Sanitation
 
 
 159
 The GCDMA also maintains a regular staff of more than three dozen sanitation workers to provide regular cleaning services within the district. See 1994 District Plan § III.2. They have cleaned sidewalks, gutters, and roadways, bagged trash, painted fire hydrants, and removed graffiti. See id.
 
 
 160
 c. Capital Improvements
 
 
 161
 The GCMDA has made many physical improvements to the district over the years, financed in part by over $32 million dollars in bonds. See 1995 Financial Statement (Joint Appendix 495, 503-05). The GCDMA has improved sidewalks and placed hundreds of new street and sidewalk lights throughout the district. It has also constructed new wheelchair ramps and shoeshine stands. It has improved and maintained the district's horticulture, planting more than 140 trees. See 1994 District Plan § IV.A; Joint Stipulation of Facts pp 20-22, 35 (Joint Appendix 466-67); Thomas J. Lueck, Business Districts Grow At Price of Accountability, N.Y. Times, Nov. 20, 1994, § 1, at 46. In addition, the GCDMA has designed new kiosks for vending intended to be operated throughout the district. See 1994 District Plan § IX.B. It planned to add decorative wall sculptures and other art work to the district as well as new recycling bins, newsstands, bus shelters, and a new network of street-signs and signals. See id. § IV.A.
 
 
 162
 d. Social Services
 
 
 163
 The GCDMA has spent large sums on its social services programs, particularly in its help to the homeless by providing a 24-hour drop-in center with outreach, assessment, referral, and job training facilities. The social service efforts of the GCDMA has been one of the most controversial aspects of the GCDMA's presence in the district and has generated several lawsuits and investigations. See infra Part IV.A.1.
 
 
 164
 e. Transportation, Aesthetics, Visitor Services, Public
 
 Events, and Promotion
 
 165
 The GCDMA has also facilitated transportation and the flow of traffic by, among other methods, setting up taxi stands. It has assisted businesses to design and install new facades and signs. It has employed the services of a retail designer, a leasing specialist, and a zoning specialist to help individual retailers improve the appearance of their storefronts. See 1994 District Plan § III.A.7. To assist visitors within the district, the GCDMA has operated tourist information booths and carts. Each year it has sponsored dozens of performing and other arts events in the public spaces of the district. It sponsors weekly tours of the district as well as an annual New Year's Eve festival. See Official Bond Statement at 12.
 
 4. Discretion
 
 166
 The GCDMA exercises wide discretion in determining how the funds it receives will be utilized. It enjoys great freedom in administering its programs. It also exercises wide latitude in determining how to allocate its funds among its different services. It is free to add, supplement, decrease or terminate programs. The District Plan, the authorizing statutes, and the contract with the City all provide illustrative lists of appropriate tasks. None of them, however, require the GCDMA to provide a particular set of services, nor do they present any guidance about how the BIDs' resources should be allocated among the programs the GCDMA does pursue. The District Plan specifically states that the GCDMA need not attempt to perform every activity enumerated in the plan.
 
 
 167
 BIDs such as the GCDMA possess such substantial budgets, provide such a wide range of services, and wield such broad authority in determining when and how their benefits will be provided, that the New York City Council referred to them as "cities within cities " in the title of its first report covering the City's BIDs. See The City Council of the City of New York, Staff Report to the Finance Committee, Cities within Cities: Business Improvement Districts and the Emergence of the Micropolis (November 8, 1995) (hereinafter City Council Staff Report, Cities Within Cities ). The report concluded that the BIDs' freedom to administer their programs largely without City supervision had resulted in patterns of abuse and mismanagement. See id. (charging instances of mismanagement; administrative waste, including excessive salaries among BID executives; illegal loans; brutality toward homeless inhabitants of the district; conflicts of interest; and the use of illegal immigrants at sub-minimum wages).
 
 
 168
 This almost unfettered discretion of the BIDs led one City Council member to remark in 1994 that a BID such as the GCDMA is a "whole new subdivision of government that is not accountable to elective officials." Thomas J. Lueck, Business Districts Grow At Price of Accountability, N.Y. Times, Nov. 20, 1994, § 1, at 46 (statement of Andrew S. Eristoff, City Council member); see also Douglas Feiden, Midtown Bonds Spark BID Controversy, Crain's New York Business, April 6, 1992, at 1 (quoting New York Senate Minority Leader Manfred Ohrenstein's statement that GCDMA constituted "private government" exercising "too much power with no control, no accountability, no review"). A deputy mayor of the City has described BIDs as entities which "creat[e] public policy in their defined geographic areas in a way that is so independent that it can become harmful." See Clifford J. Levy, Mayor Seeks Stricter Curbs on Business Improvement Districts, N.Y. Times, Sept. 5, 1996, at B1.
 
 5. Lack of City Oversight
 
 169
 What authority the City does possess over the GCDMA is outlined principally in the contract between the two entities. It allows for City supervision over the GCDMA in very general terms. Article 2A specifies that the GCDMA's activities will be subject to the "review and reasonable direction and control" of the Commissioner of the DBS. See Contract § 2A.04(a). Section 9.01 provides that the Commissioner of Business Services may attempt to suspend or terminate particular GCDMA practices if, "in the reasonable judgment of the Commissioner of the DBS," the GCDMA's actions threaten to impair or prejudice the interests of the City.
 
 
 170
 The contract fails to define with any specificity the intended scope of the City's supervisory provisions. It does not clarify the meaning of terms such as "reasonable direction" or "interests of the City," leaving such matters open to interpretation. A thorough examination of the scope of these and other provisions in the contract, as well as the recent practices under them, are important issues in this controversy which could have been developed more fully at the trial level.
 
 
 171
 Other provisions in the contract provide the City with limited power to oversee the GCDMA's operations. Section 2A.04(b) enables the Commissioner of the DBS to order the performance of specific services if the GCDMA itself has previously budgeted for these services and has failed to perform them satisfactorily. Similarly, Section 1.05 grants the Commissioner authority to withhold assessments if the GCMDA's work is unacceptable in terms of amount, quality, or fitness. This limited supervisory power of the Commissioner appears to have been exercised lightly, if at all, during the course of the BID's existence.
 
 
 172
 With respect to capital improvements, the GCDMA must provide plans and obtain the City's approval before beginning individual projects. See Contract § 2B.04. The responsibility for proposing, initiating, planning, funding, and conducting these projects, however, rests entirely with the GCDMA. In all other areas under its control, the GCDMA is under no obligation to acquire the City's approval before embarking on a project or performing a service.
 
 
 173
 While it is clear from these provisions that the City may demand that the GCDMA adequately perform some services, it is far from obvious that the contract grants the City any control over the GCDMA's important policy-making power to formulate a budget and to allocate resources among programs and services. During the ten year existence of the GCDMA the record does not indicate any occasion when the City has attempted to utilize or invoke the contract to control the GCDMA's policy making powers. This history tends to undermine the notion that the contract was designed by the parties to provide a substantive limitation upon the GCDMA's discretionary powers.
 
 
 174
 It is difficult to see on what grounds the City could object to the GCDMA's decisions to shift the public money it receives to particular projects or services. It appears that the GCDMA could decide to terminate social services and public events programs, for example, in order to increase the funding of its sanitation and security programs without violating any provision of the authorizing statutes, the District Plan, or the contract with the City.
 
 
 175
 The contract, District Plan, and authorizing statute, furthermore, establish few mechanisms or procedures through which the City can exercise day-to-day control over a BID such as the GCDMA. Some of those few procedures which do exist have apparently been ignored by the City. In 1995 the City Council staff report revealed that the City had failed to conduct a single performance evaluation of any Business Improvement District seeking to renew its BID contract despite the fact that the City's Department of Business Services had been contractually required to perform these evaluations in at least twenty instances. See City Council Staff Report, Cities Within Cities at 45. In its final conclusion the staff stated that there were "too many instances where greater oversight of BIDs has been required by [the City]." City Council Staff Report, Cities Within Cities at 98. With respect to the GCDMA, the City Council's 1997 staff report found that the Commissioner had been "negligent in its oversight responsibility." See The Council of the City of New York, Managing The Micropolis: Proposals to Strengthen BID Performance and Accountability 32 (Nov. 12, 1997) (hereinafter 1997 City Council Staff Report, Managing the Micropolis ).
 
 
 176
 Lack of oversight has fostered an assumption on the part of the GCDMA that it may operate outside the City's supervision. The current President of the GCDMA has been widely nicknamed the "Mayor of Midtown" due to the perceived breadth of his authority. See, e.g., Fred Kaplan, Giuliani Assails Leader Of 3 NYC Business Districts, The Boston Globe, July 31, 1998, at A3. The GCDMA's attorney has characterized the BID as, "a private agency, not a city agency," while the BID's president has described himself as, "a paid employee only of property owners." See Douglas Feiden, Midtown Bonds Spark BID Controversy, Crain's New York Business, April 6, 1992, at 1. One City official has been quoted as stating, "[t]he Grand Central district apparently has viewed itself as a private organization rather than an entity spending public money." See Thomas J. Lueck, Business Improvement District At Grand Central Is Dissolved, N.Y. Times, July 30, 1998, at B2.
 
 
 177
 Partly as a result of some recent disagreements between the GCDMA and the City concerning the appropriate level of oversight, the City has temporally decided not to renew the GCDMA's contract. See Thomas J. Lueck, Business Improvement District At Grand Central Is Dissolved, N.Y. Times, July 30, 1998, at B1. Renewal is nevertheless intended. See Supplemental Letter Brief of Intervenor-Appellee City of New York at 4 (Aug. 24, 1998). The City does not possess the power to dissolve the GCDMA or a successor because the GCDMA has issued bonds and remains financially obligated to satisfy its outstanding debt. See N.Y. Gen. Mun. Law § 980-n (McKinney Supp.1998).
 
 6. Election Procedures
 
 178
 State law requires that the governing board of the GCDMA be elected. See N.Y. Gen. Mun. Law § 980-m(a) (McKinney Supp.1998); N.Y. City Admin. Code § 25-414(a) (1990). According to statute, a majority of the board must be elected by property owners. See N.Y. Gen. Mun. Law § 980-m(b) (McKinney Supp.1998); N.Y. City Admin. Code § 25-414(b) (1990). The full provision of the state statute is set out in Part VII, infra, which discusses the unconstitutionality on its face of this voting provision.
 
 
 179
 The composition of the GCDMA's 52 member board is required to be heavily weighted in favor of the property owners of the district. Four members are appointed by government officials. See N.Y. City Admin. Code § 25-414(b) (1990); Bylaws of Grand Central District Management Association, art. II, § 1 (hereinafter Bylaws ). Under the current scheme, the 242 owners of real property in the district ("Class A" members) have the right to elect a majority bloc of 31 out of the 52 members. The nearly 1000 residential tenants of the district ("Class C" members), by contrast, are entitled to elect only one representative. Commercial tenants, (the "Class B" members), while they are treated more generously than the residential tenants, are relegated to 16 representatives. The board is made up as follows:
 
 31 -- elected by real property owners
 16 -- elected by commercial tenants
 1 -- elected by residential tenants
 1 -- appointed by Mayor of the City
 
 180
 1 -- appointed by the City comptroller, chief financial officer of the City1 -- appointed by Manhattan Borough president
 
 
 181
 1 -- appointed by City Council member representing council district in which the BID is located
 
 52 -- total
 
 182
 See Joint Appendix at 491-94; N.Y. Gen. Mun. Law § 980-m(b) (McKinney Supp.1998); N.Y. City Admin. Code § 25-414(b) (1990). Board members serve two year terms. See Bylaws, art. II, § 1.
 
 
 183
 The plaintiffs in the instant suit, as the resident-shareholders of a co-op, participate in the GCDMA's election process as "Class C" members. It remains unclear whether the plaintiffs can indirectly participate with the other members of the co-op in the Class A elections. If they can they would apparently share one real property vote with all the other members of their co-op.
 
 
 184
 The votes of the residents are subjected to a double dilution. If they were members of the advantaged minority of real property owners, their votes would be worth more than thirty times what they are because they would have the privilege of electing 31 members instead of just one. In addition, their votes are worth substantially less because they must cast their ballots among a pool of nearly 1000 residential voters, while the real property owners number only 242.
 
 III. LAW
 A. American Suffrage Rights
 
 185
 Appellee's contention that property-owning entities--many of them not natural persons--should have the right to control the electoral process of the GCDMA is directly contrary to the last two hundred years of American political history. At one time the franchise was regarded as the rightful possession of the most privileged and wealthy in our society. See, e.g., Ralph Ketcham, James Madison: A Biography 274 (1971) (describing Madison's approval of freehold franchise). Before the American Revolution, for example, the right to vote was limited in virtually every colony to white, Protestant, male, property-holding individuals. See Chilton Williamson, American Suffrage: From Property to Democracy, 1776-1860, at 19 (1960) (describing preference of colonial American political leaders to confine the vote "to those who were free, white, twenty-one, native born Protestant males who were the owners of property, especially real property"). This country's first president was elected by a mere six percent of the American population. See The Statistical History of the United States 1071 (Ben J. Wattenberg, ed., 1976).
 
 
 186
 Since this nation's founding the right to vote has been steadily expanded to include larger and larger classes of Americans citizens. Over the course of the last two hundred years, both the states and the federal government have stripped away those restrictions which once limited suffrage to a privileged minority. The United States Constitution has been amended repeatedly in order to remove voting restrictions based on race, sex, place of residence, wealth, and age. See U.S. Const. amend. XV (forbidding all voting restrictions based on "race, color, or previous condition of servitude" (ratified 1870)); U.S. Const. amend. XIX (forbidding voting restrictions based on sex (ratified 1920)); U.S. Const. amend. XXIII (granting District of Columbia residents the right to vote in presidential elections (ratified 1961)); U.S. Const. amend. XXIV (eliminating poll tax in federal elections (ratified 1964)); U.S. Const. amend. XXVI (forbidding restrictions based on age for those citizens over eighteen years old (ratified 1971)).
 
 
 187
 Other restrictions, based on such factors as property ownership, taxpaying status, and religious preference have also been eliminated through legislative and judicial means. See, e.g., The Voting Rights Act of 1965, 42 U.S.C. §§ 1971, 1973-1973bb-1 (1994) (forbidding state voting schemes which have discriminatory impact and authorizing United States Department of Justice to investigate state reapportionments); Kramer v. Union Free Sch. Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (invalidating state law which limited the right to vote in school board election to property owners and those with school-age children), rev'g 282 F.Supp. 70 (E.D.N.Y.1968) (3 judge panel, Weinstein, J., dissenting); Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (striking down state poll tax as a violation of Equal Protection Clause); Marchette Chute, The First Liberty: A History of the Right to Vote in America, 1619-1850, at 311 (1969) (maintaining that, by 1853, "the principle which linked property to the vote was ... almost completely discredited in the United States"); Chilton Williamson, American Suffrage: From Property to Democracy, 1776-1860, at 272 (1960) (describing "gradual removal of property and taxpaying qualifications for voting in a majority of the states" during nineteenth century); cf. Albert J. Rosenthal, Afterword, in Constitutionalism and Rights: The Influence of the United States Constitution Abroad 397, 400 (Louis Henkin & Albert J. Rosenthal eds., 1990) ("Property qualifications for voting, common when the Constitution was adopted, gradually disappeared, but de facto discrimination resulting from poverty has been only partly eliminated."). But see Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) (allowing voting restrictions based on property ownership in limited circumstances).
 
 
 188
 Today all American citizens over the age of eighteen are eligible to vote in federal elections if they register and are not subject to a voting disability. Cf. Lynne M. Casper & Loretta E. Bass, U.S. Bureau of the Census, Current Population Report P20-504, Voting & Registration in the Election of November 1996 5 tbl.4 (1998) (approximately 71% of 180 million voting age American citizens registered to vote in November 1996 election).
 
 
 189
 The power to vote is respected as a "fundamental right" under the Fourteenth Amendment of the Constitution. See Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). It is also deemed a basic right by international consensus. See, e.g., Universal Declaration of Human Rights, Dec. 10, 1948, art. 21 (requiring "genuine elections which shall be by universal and equal suffrage"); International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 25, 999 U.N.T.S. 171 (requiring "universal and equal suffrage"); American Convention on Human Rights, Nov. 22, 1969, art. 23(b), O.A.S.T.S. No. 36 (requiring "universal and equal suffrage"); American Declaration of the Rights and Duties of Man, May 2, 1948, art. 20 ("Every person having legal capacity is entitled to participate in the government of his country ... and to take part in popular elections....").
 
 
 190
 State or federal efforts to abridge or deny the voting rights of citizens are subjected to the strictest constitutional scrutiny. See Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ("[W]hen [First and Fourteenth Amendment rights] are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992))); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Kramer v. Union Free Sch. Dist., 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). Emphasis on this basic right to vote is essential to the fair workings of the democratic process under our republican form of government. See, e.g., John Hart Ely, Democracy and Distrust: A Theory of Judicial Review 116-125 (1980) ("Not only has the Fourteenth Amendment underscored our commitment to equality in the distribution of various goods ... but several other amendments, in fact most of the recent ones, have extended the franchise to persons who previously had been denied it, thereby reflecting a strengthening constitutional commitment to the proposition that all qualified citizens are to play a role in the making of public decisions."); Cass R. Sunstein, The Partial Constitution 142-44 (1993) ("[R]ights-based constraints on the political process are necessary for a well-functioning democracy.... Governmental interference with the right to vote ... calls for active judicial protection of the background conditions for political deliberation, political equality, and citizenship.").
 
 
 191
 Our commitment to expanding and preserving the right to vote is an affirmation of the observation made by Alexis de Tocqueville over one hundred and fifty years ago. "[T]he further that electoral rights are extended," he stated, "the greater is the need of extending them; for after each concession the strength of the democracy increases, and its demands increase with its strength." Alexis de Tocqueville, Democracy in America 57 (Richard D. Heffner, ed., 1956).
 
 B. The One Person, One Vote Principle
 
 192
 As suffrage has been expanded those who would participate fully in the American electoral process have had to overcome other obstacles. Devices, such as the poll tax, have been utilized by those who tried to re-introduce classifications of wealth into the electoral system. Another exclusionary mechanism has been the dilution of the vote through gerrymandering or preserving "rotten boroughs," multiplying the power of the vote in districts where the ratio of voters to representatives is relatively low. Concomitant with the expansion of the franchise has come a recognition that those who enjoy the right to vote must have their votes accorded equal weight with those of other voters.
 
 
 193
 In Wesberry v. Sanders, the Supreme Court held that Article I, Section 2 of the United States Constitution required that congressional representatives be chosen in a manner which affords all voting citizens an equal voice in the electoral process. See Wesberry v. Sanders, 376 U.S. 1, 7-8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1963) ("[A]s nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."). Wesberry eliminated a system that disadvantaged city and suburban voters, giving them less than a proportionate share of control over government.
 
 
 194
 In its radical restructuring of our political life the Court in Wesberry recognized that equality of voters is of paramount importance because the vote serves as the foundation for the guarantee of all other personal liberties:
 
 
 195
 No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.
 
 
 196
 Wesberry, 376 U.S. at 17-18, 84 S.Ct. 526.
 
 
 197
 After Wesberry the rule of proportionate representation was applied to all other levels of government. In Reynolds v. Sims the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment required that both houses of a state legislature be apportioned on a population basis. See Reynolds v. Sims, 377 U.S. 533, 568, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."); see also WMCA, Inc. v. Lomenzo, 377 U.S. 633, 653, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964) ("However complicated or sophisticated an apportionment scheme might be, it cannot, consistent with the Equal Protection Clause, result in a significant undervaluation of the weight of the votes of certain of a State's citizens merely because of where they happen to reside.").
 
 
 198
 In 1965 Congress sought to ensure the uniform and consistent application of the one person, one vote principle in state and federal elections by the Voting Rights Act of 1965. See 42 U.S.C. §§ 1971, 1973-1973bb-1 (1994). Soon thereafter the one person, one vote rule was applied to subdivisions of the states. See Avery v. Midland County, 390 U.S. 474, 480, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) ("If voters residing in oversize districts are denied their constitutional right to participate in the election of state legislators, precisely the same kind of deprivation occurs when the members of a city council, school board, or county governing board are elected from districts of substantially unequal population."); see also Hadley v. Junior College Dist., 397 U.S. 50, 53-54, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) ("[A] qualified voter in a local election ... has a constitutional right to have his vote counted with substantially the same weight as that of any other voter ...."); cf. Kramer v. Union Free Sch. Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (exclusion of non-property owners without school age children from voting rolls of local school board is unconstitutional).
 
 
 199
 Hadley and Avery 's application of the one person, one vote rule to local forms of government represented the natural and necessary evolution of this fundamental principle of our republican form of government. Government to most people most of the time is the one they see in operation--municipal authority. Substantial responsibilities are delegated to local governments and the lives of individual citizens are critically impacted by their work. As the Supreme Court observed in Avery:
 
 
 200
 Legislators enact many laws but do not attempt to reach those countless matters of local concern necessarily left wholly or partly to those who govern at the local level.... In a word, institutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens. We therefore see little difference, in terms of the application of the Equal Protection Clause and of the principles of Reynolds v. Sims, between the exercise of state power through legislatures and its exercise by elected officials in the cities, towns, and counties.
 
 
 201
 Avery v. Midland County, 390 U.S. 474, 481, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).
 
 
 202
 The Court's observations on the importance of local government are even more accurate today than they were in 1968 in view of the increasing urbanization of the nation and the growing complexity of its life. American citizens today are likely to be most familiar with their local government because their day-to-day lives will probably be critically affected by the decisions of these local institutions. The election of a local official, the Supreme Court pointed out in Hadley, may be far more important to local residents than the election of a United States Senator. See Hadley v. Junior College Dist., 397 U.S. 50, 55, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).
 
 
 203
 In Avery a board of county commissioners was held subject to the one person, one vote requirement because the board exercised broad discretion in providing an array of services which affected the residents within its jurisdiction.
 
 
 204
 [T]he [Commissioners] court does have power to make a large number of decisions having a broad range of impacts on all the citizens of the county. It sets a tax rate, equalizes assessments, and issues bonds. It then prepares and adopts a budget for allocating the county's funds, and is given by statute a wide range of discretion in choosing the subjects on which to spend. In adopting the budget the court makes both long-term judgments about the way Midland County should develop--whether industry should be solicited, roads improved, recreation facilities built, and land set aside for schools--and immediate choices among competing needs.
 
 
 205
 Avery v. Midland County, 390 U.S. 474, 483, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).
 
 
 206
 Hadley extended the one person, one vote requirement to local bodies whose scope of activity was much narrower than those in Avery. At issue in Hadley was the election of a board of trustees for a local junior college district. Unlike the commissioners in Avery, who were responsible for providing a wide range of governmental services, the board of trustees in Hadley provided one specific municipal service--junior college education. The fact that the trustees were responsible for providing a narrowly defined program, nevertheless, did not place them outside the requirements of the one person, one vote principle.
 
 
 207
 The relevant inquiry for the Court in Hadley was not how many services the local body provided but rather the importance of the assistance it provided to the community and the amount of discretion allowed. Education, the Court pointed out, has traditionally been a "vital governmental function." Hadley v. Junior College Dist., 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). The trustees enjoyed significant discretion in the performance of their public duties. They had the ability to levy and collect taxes, issue bonds (with certain restrictions), hire and fire teachers, make contracts, collect fees, and supervise and discipline students. The impact of these activities on the community as a whole, the Court reasoned, warranted the application of the one person, one vote requirement:
 
 
 208
 We feel that these powers, while not fully as broad as those of the Midland County Commissioners, certainly show that the trustees perform important governmental functions within the districts, and we think these powers are general enough and have sufficient impact throughout the district to justify the conclusion that the principle which we applied in Avery should also be applied here.
 
 
 209
 Hadley, 397 U.S. at 53-54, 90 S.Ct. 791.
 
 
 210
 The need for innovation in local government has been recognized by commentators since the one person, one vote principle was first recognized. See, e.g., Jack B. Weinstein, The Effect of the Federal Reapportionment Decisions on Counties and Other Forms of Municipal Government, 65 Colum. L.Rev. 21, 32 (1965) ("Ours is a mixed society with private, public and quasi-public organizations developing simultaneously. Given the pragmatic bent of our people and the very large discretion they have to develop methods of exercising power locally, wide divergencies in organizational patterns are to be expected."). When balancing the values of innovation and the fundamental precepts of our democracy, however, the Court has consistently protected the one person, one vote principle from encroachment no matter what the form of local government. See, e.g., Board of Estimate v. Morris, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) (invalidating disproportionate scheme for New York City's Board of Estimate); City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) (vote to approve issuance of City bonds); Kramer v. Union Free Sch. Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (school board). The narrow exception for water districts described in Part IV.C, infra, does not modify the main thrust of the uniform one person, one vote decisions.
 
 
 211
 Since Hadley the federal and state courts have applied the one person, one vote principle to boards of agriculture, school boards, and other entities of local concern. See Hellebust v. Brownback, 42 F.3d 1331 (10th Cir.1994) (state board of agriculture); Baker v. Regional High Sch. Dist., 520 F.2d 799 (2d Cir.1975) (school board); Jackson v. Nassau County Bd. of Supervisors, 818 F.Supp. 509 (E.D.N.Y.1993) (County Board of Supervisors); Cunningham v. Municipality of Metro. Seattle, 751 F.Supp. 885 (W.D.Wash.1990) (entity in charge of water pollution abatement and public transportation for county); In re Lower Valley Water & Sanitation Dist., 96 N.M. 532, 632 P.2d 1170 (N.M.1981) (sanitation and water district); Johnson v. Lewiston Orchards Irrigation Dist., 99 Idaho 501, 584 P.2d 646 (Idaho 1978) (supplying fresh water to city residents, Salyer distinguished); Choudhry v. Free, 17 Cal.3d 660, 131 Cal.Rptr. 654, 552 P.2d 438 (Cal.1976) (supplying potable water, electric power, sewage disposal and recreational facilities, Salyer distinguished); Burrey v. Embarcadero Mun. Improvement Dist., 5 Cal.3d 671, 97 Cal.Rptr. 203, 488 P.2d 395 (Cal.1971) (transit, police, and fire district).
 
 
 212
 IV. APPLICATION OF ONE PERSON, ONE VOTE REQUIREMENT TO THE GRAND CENTRAL BID
 
 
 213
 The virtual exclusion of the plaintiffs' voice from the governance of their own Business Improvement District is an unacceptable derogation of the one person, one vote principle. These "cities within cities" are performing an increasing number of important governmental functions in our country. The GCDMA spends millions of municipally raised tax dollars every year to provide a wide range of governmental functions, including security, sanitation, capital improvements, social services, promotion of tourism, transportation control, and public events. In performing these services the GCDMA exercises a degree of policy-making authority and discretion which rivals that of any municipal agency. There is no basis in law, therefore, for holding that the GCDMA is free to exclude its own residents from meaningfully participating in the BID's administration through the vote for the board. While BIDs may not fit neatly within the traditional definition of a government entity, this fact alone does not exempt them from the fundamental requirements of our republican form of government. All residents of the Grand Central BID are entitled to a meaningful voice in governance. The one person, one vote mandate of the Fourteenth Amendment requires it, as does our fundamental sense of democracy.
 
 
 214
 As in both Hadley and Avery, the GCDMA performs important governmental functions which directly impact the lives of all those who live and work within its jurisdiction. Some of the services, such as security, sanitation, social services, capital improvement, maintenance of public roads, and promotion of tourism, are traditional functions of government. In fact, the GCDMA provides a far broader range of traditional governmental services than that provided by the board of trustees in Hadley.
 
 
 215
 The GCDMA is also subject to the one person, one vote requirement because of the substantial discretion it enjoys in determining which services will be provided within the district and how and when they will be performed. As in Hadley and Avery, the GCDMA has the freedom to shape and tailor the provision of municipal services in the district according to its own policy and legislative preferences. The fact that the residential tenants may wish to effectuate a different set of policies than those of the GCDMA's board is more, not less, reason to open up the GCDMA to fair elections.
 
 A. Impact On Residents of the BID
 
 216
 The GCDMA impacts the daily lives of the residents of the district in a large variety of ways. As already noted, among other things the GCDMA provides municipal services such as security, sanitation, help to the homeless, and maintenance of public streets and roads. These functions, and the manner in which the GCDMA chooses to provide them, have a profound effect upon those who reside in this part of Manhattan. In view of the law already described in Part III, supra, these services constitute an array requiring application of the one person, one vote principle.
 
 1. Services
 
 217
 The large police agency of the GCDMA works closely with the City Police to enforce state and city law throughout the district. See supra Part II.C.3.a. Operation of a police force is a sensitive and challenging undertaking which carries with it many potential dangers as well as benefits for the residents and inhabitants of the district. How the GCDMA hires, trains, assigns, supervises, and disciplines its security detail can have a dramatic effect on the lives of all those who reside where the guards patrol. District residents' views on such subjects may differ from those of property or business owners.
 
 
 218
 Every year the GCDMA spends millions of dollars to keep the streets, roads, and sidewalks of the district clean and to make a wide range of capital improvements that affect everyone in the district. Its activities in transportation, aesthetics, visitor services, public events, and promotion of retail establishments all have a profound impact on residents. See supra Part II.C.3.e.
 
 
 219
 The GCDMA's social services are of great importance to the district's inhabitants who may feel threatened or concerned about the homeless. In a 1995 City Council report, the GCDMA's social services program was cited by the New York City Council as a paradigmatic example of the lack of accountability among New York's BIDs:
 
 
 220
 The importance of implementing an adequate complaint resolution process is best demonstrated by the case of the Grand Central Partnership Social Services Corporation (GCSSC) [the social service branch of the GCDMA]. Long before allegations were made in 1995 that GCSSC workers operated as "goon squads," the GCSSC was the subject of two separate $5 million lawsuits stemming from incidents in 1990 and 1992 which alleged that GCSSC workers in the Multi-Service Center used excessive physical force against homeless people. The GCSSC failed to use these incidents as an early warning system and subsequently lost Federal funding in 1995 after the U.S. Department of Housing and Urban Development (HUD) determined that there were incidents of physical harassment/assault against homeless individuals by GCSSC outreach workers.
 
 
 221
 City Council Staff Report, Cities Within Cities at 26. While it is possible that these alleged abusive practices were not sanctioned or encouraged by the GCDMA itself, such potential episodes demonstrate how the safety and well-being of the inhabitants of this portion of Manhattan can be powerfully touched by the GCDMA's presence and operation.
 
 
 222
 In short, the GCDMA plays a substantial role in creating and shaping the environment in which the plaintiffs and other residents spend their daily lives. It does so with public assessments, collected by the City.
 
 2. Compared to Powers in Hadley
 
 223
 More than in Hadley, the daily lives of the district's residents are impacted by the GCDMA's provision of municipal services. Hadley involved a single board of trustees which supervised junior college education. Here the GCDMA provides a wide range of important governmental services, all of which affect the daily lives of the district's residents. The GCDMA's decision regarding the hiring, training and supervision of its security and social service employees, for example, is arguably as important to the residents of the district as the trustees' decisions in Hadley regarding the hiring and firing of teachers or the supervision and disciplining of students. Like the trustees in Hadley, the GCDMA enters into contracts and issues bonds.
 
 
 224
 While the GCDMA does not directly levy taxes, it plays a substantial role in determining the levels of the assessments which are collected on its behalf by the City and it enjoys a contractual right to receive those assessments directly from the City. The GCDMA possesses and exercises powers which are superior to those which the Court in Hadley found to be general and significant enough to justify the one person, one vote requirement.
 
 3. Effect on Nonproperty Owners
 
 225
 Appellees contend that the plaintiffs are not "affected" by the GCDMA's activities because they are not property owners and therefore do not "pay" for the services. In all likelihood the tenants of the district do in fact "pay" for the services of the GCDMA in the form of higher rents passed on as a result of higher real property "taxes." City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), recognized that tenants and consumers often end up paying for property tax increases in the form of higher rents or prices. See Kolodziejski, 399 U.S. at 210, 90 S.Ct. 1990 ("Property taxes may be paid initially by property owners, but a significant part of the ultimate burden of each year's tax on rental property will very likely be borne by the tenant rather than the landlord....").
 
 
 226
 Even if tenants and co-op residents do not absorb BID assessments, appellees' argument is untenable. As already demonstrated, our nation has long since discarded the antiquated and elitist notion that only property owners enjoy a sufficient "stake" in society to deserve the franchise. Furthermore, the Supreme Court has previously addressed and rejected the appellees' payment of taxes argument. See City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1970); Kramer v. Union Free Sch. Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).
 
 
 227
 In Kramer the Supreme Court held that the plaintiff could not be excluded from voting in his local school board election even though he did not have school age children of his own and neither owned nor leased real property. The Court found that the plaintiff's right to an equal vote in this important aspect of local government could not be denied on the grounds that the schools in the district were funded primarily by property taxes. See Kramer, 395 U.S. at 631-33, 89 S.Ct. 1886.
 
 
 228
 In Kolodziejski, the Court considered a challenge to a state statute which excluded nonproperty owners from participating in bond elections. The state argued that this exclusion was justified because the bonds were financed by an increase in property taxes and therefore placed a "special burden on property owners." See Kolodziejski, 399 U.S. at 208, 90 S.Ct. 1990. The Supreme Court rejected the state's argument, finding that any differences in the interests of property owners and nonproperty owners were not sufficient to justify a departure from the one person, one vote principle. "[P]roperty owners and nonproperty owners alike," the Court reasoned, "have a substantial interest in the public facilities and the services available in the city and will be substantially affected by the ultimate outcome of the bond election at issue in this case." Id. at 209, 90 S.Ct. 1990. "Presumptively," the Court continued, "when all citizens are affected in important ways by a governmental decision subject to a referendum, the Constitution does not permit weighted voting or the exclusion of otherwise qualified citizens from the franchise." Id.
 
 
 229
 The fact that there is some overlap between the BID's services and the City's services does not immunize the GCDMA from the one person, one vote requirement. Inhabitants of cities receive their public services from a complex of local, state, and federal entities. All these different public units supplement, augment, and exchange services with one another, but this concurrence of powers is not a basis for undermining the applicability of the one person, one vote principle to any one of them. See, e.g., Hellebust v. Brownback, 42 F.3d 1331, 1334-35 (10th Cir.1994) ("The Board's partial dependence on the actions of other state entities does not restrict the range of governmental powers it wields. Indeed, in a traditional system in which one branch of government is subject to the checks and balances of another, such dependence is the norm.").
 
 
 230
 Appellees' attempt to dismiss the GCDMA's activities as "supplemental" to the City's services misses the mark. Collectively the proliferation of BIDs throughout New York allows the City to maintain or decrease the level of services it provides to the City as a whole. See infra Part VI. In any event, the GCMDA's activities are substantial in their own right, involving the annual expenditure of approximately 12 million dollars on a vast array of different services.
 
 
 231
 All the residents of the Grand Central BID have a right to meaningfully participate in the GCDMA's electoral process because the GCDMA daily substantially impacts the lives of all of them (transient workers and visitors are not entitled to vote under our traditional voting system). There is no justification for allowing the corporate and individual entities who own land within the district to reduce the electoral participation of the district's residents.
 
 B. Discretion In Running BID
 
 232
 As in both Hadley and Avery, the one person, one vote requirement is warranted because the GCDMA has wide discretion and great policy making authority in deciding how New York's public funds will be utilized. It exercises broad policy discretion in allocating its budget among the large array of programs it is authorized to provide. The GCDMA may provide any and all services which advance the "enjoyment and protection of the public and the promotion and enhancement of the District." Like the county commissioners in Avery, the GCDMA makes long-term judgments about the way the district should develop when it decides to spend money in one way rather than in another. "[A] decision not to exercise a function within the [local body's] power," the Court pointed out in Avery, "is just as much a decision affecting all citizens of the county as an affirmative decision." Avery, 390 U.S. at 484, 88 S.Ct. 1114. With a substantial budget at its disposal, the GCDMA determines which services to provide in the district, how and when they will be rendered, and who will receive their benefits.
 
 
 233
 The GCDMA decides, for example, such matters as how many security guards will patrol the district, where they will patrol, which kinds of behavior they will monitor, and the manner in which they will conduct themselves on the streets. It decides how to supervise and discipline its security force, and whether to implement procedures or safeguards to help ensure that those who have been charged with protecting the public do not infringe upon the personal rights of individuals. The GCDMA decides which streets within the district will be the cleanest, the most well lit, and the most closely patrolled. It decides who within the district will get "extra" street lights, trash collection, assistance in upgrading and cleaning facades and signs, and graffiti removal. The GCDMA decides whether to operate homeless shelters within the district and, if so, where, how many and what types of services these centers will provide. It decides where tourist information centers will be located and where within the district the taxi stands will located. It also plays the leading role in determining when and where millions of dollars of city money and tax exempt bond proceeds will be used to make capital improvements within the district. See, e.g., Tom Gallagher, Trespasser on Main St. (You!), 261 The Nation 787, 788 (Dec. 18, 1995) (suggesting that the GCDMA's decision to spend $1.3 million dollars to install floodlights for the Lincoln Building was related to that building's ownership by the GCDMA's chairman).
 
 
 234
 The salaries of the GCDMA's employees and other allocations of resources are issues which affect all those within the district. The current board of the GCDMA has voted to allocate over $100,000 per year to the salary of the president. The district's security and sanitation chiefs have reportedly earned more than the City's Police and Sanitation Commissioners. See City Council Staff Report, Cities within Cities. By contrast, a federal trial court's finding that the current board decided to pay sub-minimum wages to many of its other employees has resulted in a legal verdict against the BID. See Archie v. Grand Cent. Partnership, Inc., 997 F.Supp. 504 (S.D.N.Y.1998) (finding GCDMA had violated Fair Labor Standards Act and New York State Minimum Wage Act by paying workers sub-minimum wages, and ordering GCDMA to pay back wages, damages, and attorneys' fees).
 
 
 235
 In formulating budgets, allocating finite resources, and making important policy decisions regarding the safety, health and welfare of those within the BID, it is imperative that the GCDMA fairly represent the interests of all voters within the district. As it is currently constituted, the GCDMA effectively represents only a select minority of those found within the BID. Much in the same way that the franchise was once delegated in this country to the privileged few who enjoyed status and wealth, the voting scheme of the GCDMA excludes the majority of the residents of the BID from meaningfully participating in the political affairs of their own community.
 
 
 236
 It may be that the residential tenants of the district would seek policies other than the ones currently adopted by the property owners who now control the GCDMA. Such potential disparities of interests and policies require enforcement of the one person, one vote principle. Exclusion from appropriate participation in the GCDMA on the basis of viewpoint is an unacceptable violation of the Fourteenth Amendment's guarantee of equal protection. See, e.g., Carrington v. Rash, 380 U.S. 89, 94, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) ("Fencing out from the franchise a sector of the population because of the way they may vote is constitutionally impermissible.").
 
 
 237
 C. Salyer Exception to the One Person, One Vote Principle Does Not Apply to the Grand Central BID
 
 
 238
 Appellees argue that the one person, one vote is inapplicable to the GCDMA because of a narrow exception invoked in Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) and Ball v. James, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981). They are supported by dicta in Hadley v. Junior College District. "It is of course possible," the Court stated there, "that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with Reynolds, supra, might not be required...." See Hadley v. Junior College Dist., 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).
 
 
 239
 Salyer and Ball both involved local districts whose primary functions were related to the reclamation and distribution of water. The Court in both cases found that the one person, one vote requirement was inapplicable because the functions of the water districts were of a sufficiently limited nature and the activities of the district disproportionately affected one specific group within the district--primarily farmers, who use great quantities of water for irrigation. See Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 735, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); Ball v. James, 451 U.S. 355, 370-71, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981) (5-4 decision) (extending Salyer to district supplying agricultural as well as drinking water and supplying electricity); see also Associated Enters. v. Toltec Watershed Improvement Dist., 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973).
 
 
 240
 Salyer is instructive on the dangers even so narrow a service as supplying water for irrigation may pose when equality of voting principles are ignored. One corporation cast a majority of the votes as a result of its huge landholdings. It used that vote to the disadvantage of the smaller landholders and residents by preventing flood control measures that might interfere with its activities outside the water district. See Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 736, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) (Douglas, J., dissenting). Suffrage so diluted is a charade.
 
 
 241
 The "special purpose" exception of Salyer and Ball to the fundamental constitutional principle of equal suffrage must be applied narrowly to factual circumstances and contexts similar to the ones in those cases. In the instant case the facts are far different. The GCDMA does not fall within an exception to the one person, one vote requirement because its activities do not disproportionately affect narrow classes of persons within the district.
 
 1. Not A "Limited Purpose" District
 
 242
 Appellees suggest that the purpose of the GCDMA is limited in scope because it only seeks to "promote business." See Brief of Defendant-Appellee Grand Central District Management Assoc., Inc. at 18 (describing GCDMA's activities as "aimed squarely at business improvement"). This characterization is misleading. The phrase "promotion of business" is too amorphous to provide any substantive limitation on the BID's activities. Every municipal service affects business in some sense because it affects the welfare of the community. In any event, the GCDMA is not "limited" by statute or contract to those activities which directly promote business.
 
 
 243
 The Grand Central BID provides a far wider range of governmental services than the water districts in Salyer and Ball. The general services provided by the GCDMA have a dramatic impact upon all groups and residents within the district. Its activities are far more typical of general local governmental services than of those involved in Salyer and Ball. In Ball the Court reasoned that the water district at issue did not fall within the one person, one vote requirement because the district did not perform normal governmental activities such as "the maintenance of streets, the operation of schools, or sanitation, health, or welfare services." Ball, 451 U.S. at 366, 101 S.Ct. 1811. In the instant case, the GCDMA performs at least three of these paradigmatic governmental functions. In addition, the GCDMA provides other "core" governmental functions to the district such as the provision of security.
 
 
 244
 The fact that the Grand Central Business Improvement District does not provide the district with all possible governmental services and functions is not dispositive. Even a single governmental function may be sufficient to invoke the one-person-one-vote principle. See Hadley v. Junior College Dist., 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) (junior college education); Kramer v. Union Free Sch. Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (school board). It is the importance of the government functions, and their applicability to a broad range of citizens, which makes the one person, one vote constitutional requirement applicable. Local government may not, by carving up its civic services and functions into a multitude of "specializations," each one subject to privatization, immunize the municipality from the strictures of one person, one vote.
 
 
 245
 It is irrelevant that the majority of space within the Grand Central BID is used for commercial purposes. Regardless of whether they own property or rent it, the residents who live within the district have a right to their proportionate share of electoral power because their lives are directly and substantially impacted by the presence and activities of the GCDMA-in effect a governmental entity.2. Does Not "Disproportionately Affect" a Limited Number of Persons
 
 
 246
 Appellees contend that the GCDMA "disproportionately" affects owners of real estate and that the BID is therefore entitled to ignore the one person, one vote principle. They base this contention principally upon the fact that the assessments for the GCDMA are levied against real property. The appellees' argument is flawed for several reasons.
 
 
 247
 First, as already noted, there is no reason to believe that a large portion of the assessments levied for the GCDMA are not being passed on to the residential and commercial tenants of the district through rents. In its 1997 report, the New York City Council observed that, "[i]n many cases, property owners within a BID will readily pass their assessment to commercial tenants located within their property." City Council Staff Report, Managing the Micropolis at 46.
 
 
 248
 The question of who pays the most in assessments is not equivalent to the issue of who is affected by the GCDMA. As pointed out earlier, while the ownership of property or the payment of poll taxes was at one time a prerequisite for the franchise, our country has repudiated the notion that an individual's political voice should rise or fall in proportion to the size of his or her contributions to the community's wealth. See supra Part IV.A.3; City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Kramer v. Union Free Sch. Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). The possibility that property owners may contribute more to the municipal coffers than tenants does not entitle the property owners to a greater electoral voice in the governance of the district which directly affects the lives of so many residents.
 
 
 249
 The services the GCDMA provides affect all those who live within the district. Everyone, residents, tenants, owners, and businesspeople alike, derives benefits from the proper maintenance, upkeep, and beautification of the district. Everyone within the district derives benefits from the existence of clean, safe, and well lit streets and sidewalks, from the successful operation of social services programs and from the efficient flow of pedestrian and vehicular traffic. Everyone, tenants and owners alike, suffers from the detriments of a poorly organized or inefficiently operated BID. Everyone within the district is subject to the potential difficulties which result from inadequate or irresponsible supervision of security, sanitation, or social service programs.
 
 3. Quasi-Public Nature
 
 250
 In an effort to distinguish itself from those public bodies which have been held subject to the one person, one vote requirement, appellee GCDMA attempts to denigrate the quasi-public nature of BIDs such as the GCDMA and portray itself as just another "private, non-profit entity." See Brief of Defendant-Appellee Grand Central District Management Association, Inc. at 2. This characterization is disingenuous.
 
 
 251
 The broad array of services the GCDMA provides must be construed as "municipal" services partly because they are made possible by a special municipal "tax" specifically collected by the City of New York for the purpose of funding the GCDMA's activities. There is nothing voluntary about these assessments which all property owners within the district must pay to fund the GCDMA. Those who wish to avoid supporting the GCDMA are subject to the full weight of the City's coercive collection powers.
 
 
 252
 While not every institution or group which receives money from the City to perform services is bound by one person, one vote strictures, the GCDMA is not like other private institutions. Unlike a religious or charitable organization which exists independently of the grants it receives from the government, BIDs such as the GCDMA are created by public statute for the very purpose of receiving and redistributing public monies. When the appropriate city and state officials decide to establish a new BID, it is with the understanding that the BID will function as a quasi-public entity with public responsibilities. While it may be free to solicit private funds from other sources (as is the City itself), the GCDMA derives over 80% of its budget from the city assessments and other public funds collected on its behalf.
 
 
 253
 Of great significance is the fact that the GCDMA plays a substantial role in determining the level of city taxation which will be assessed on its behalf. It has been cogently argued that this feature of BIDs makes them susceptible to the "under color of state law" requirement of section 1983 claims. See Heather Barr, Note, More Like Disneyland: State Action, 42 U.S.C. § 1983, and Business Improvement Districts in New York, 28 Colum. Hum. Rts. L.Rev. 393, 427 (1997) ("The BID Act allows BIDs to play an extremely active role in the administration of local taxes--this involvement is performance of a public function and should satisfy the 'under color of' requirement of § 1983.").
 
 
 254
 The functions performed by the GCDMA are traditionally governmental in nature. Security, sanitation, social services, and the maintenance of public streets, for example, are typically construed as "core" governmental functions.
 
 
 255
 Finally, the GCDMA is not like other private institutions because it exercises great policy discretion in determining how the City's property assessments are utilized. After receiving the funds which are collected on its behalf, the GCDMA is free to formulate its own budget for their expenditure. The lack of effective direction or supervision on the part of the City makes these mini-cities such as the GCDMA particularly fitting subjects for the one person, one vote requirement. See supra Parts II.C.5 & II.C.6.
 
 
 256
 V. CITY'S PURPORTED OVERSIGHT NO JUSTIFICATION FOR DISCRIMINATION AGAINST NONPROPERTY OWNERS
 
 
 257
 Appellees contend that the application of the one person, one vote principle to the GCDMA is not justified because the City exercises sufficient control over the BID's activities. This argument is mistaken for several reasons. First, the City appears to have neither the authority nor the resources to monitor and control the GCDMA's essential policy-making powers. See supra Parts II.C.5 & II.C.6. Second, even if it were true that the City "controlled" the GCDMA in some sense, this fact would not justify the virtual exclusion of the non-property owners from participation in control of their BID. The possibility that the City might occasionally intervene in the GCDMA's affairs is not an adequate substitute for the nonproperty owners' equal electoral participation in the BID's governance.
 
 
 258
 Even when they enjoy an equal vote, those individuals without property struggle to match the political and economic influence wielded by the commercial and non-commercial real estate holders in the City of New York. See infra Part V.C. It is impractical, therefore, to think that nonproperty holders in New York City will be able to consistently pressure City officials to intercede on their behalf in a BID controlled by property owners.
 
 A. Lack of City Control
 
 259
 The City of New York does not exercise such tight control or supervision over the GCDMA's activities as arguably might justify a departure from the one person, one vote principle. In the past the GCDMA has exercised virtually unfettered freedom to make its own policy decisions regarding the provision of services. See supra Part II.C.5. In light of the undeveloped state of the record, it is difficult to define with much precision the contours of the City's oversight of the GCDMA. It does appear from the City's past actions that the parties themselves have not viewed the contract or the District Plan as a substantive limitation upon the GCDMA's discretionary authority to allocate its resources according to its own policy preferences. It is unlikely that there will be much City supervision since one of the perceived advantages of the BIDs is that "privatization" is a good policy because it provides an escape from the City's bureaucrats. Yet, when a body such as the GCDMA retains broad discretionary power to carry out a large range of municipal services, which impact the daily lives of a great number of people, the scope and source of the City's control over these municipal services must be explicit and unambiguous if it is to arguably substitute for voter control.
 
 
 260
 As a practical matter, the City's procedures for supervising the GCDMA have been inadequate as a substitute of the one person, one vote requirement. The entire responsibility for controlling the GCDMA's myriad activities and policy decisions has been vested in the office of the Commissioner of Business Services. This one agency is responsible for promoting business in all five boroughs of New York. In addition to the programs which it itself runs, the Commissioner is supposed to oversee the activities of forty business improvements districts spread throughout New York City. In its 1995 report the New York City Council concluded that the City Administration had "failed to allocate the sufficient resources needed for DBS to conduct effective oversight of ongoing BID activity." See City Council Staff Report, Cities Within Cities at iv-v.
 
 
 261
 Evidently the City's most effective course of action in dealing with BIDs such as the GCDMA is to wait until the five year contract terms expire and then to choose not to renew its relationship with the BID. This, in fact, is the course of action actually taken by the City of New York with respect to the GCDMA. An opportunity to remedy abuses which comes but once in five years is an inadequate substitute for the vote in controlling a "city within a city" such as the GCDMA.
 
 
 262
 B. Discrimination in Provision of Municipal and Governmental Services
 
 
 263
 The crux of appellees' argument with respect to city supervision is that those without property will be able to compensate for their exclusion from the BID's board by virtue of their ability to pressure City officials to intercede and represent their interests in the governance of the BID. Even if the City were in a position to monitor and supervise the BID's day-to-day affairs, it is impractical to think that those without property can continually influence City government to act on their behalf in view of the difficulties nonproperty owners have traditionally faced in competing with the powerful interests of the real estate lobby. See infra Part V.C. Those without property have consistently occupied the bottom, not the top, in the fight for political influence.
 
 
 264
 Even when they possess an equal vote, those without wealth often are not able to exert the political power and influence necessary to ensure equality in the provision of municipal services. As Thomas Sherrard observed:
 
 
 265
 [I]n the competitive struggle for the cities' goods the slum areas and their residents are also the losers in terms of schools, jobs, garbage collection, street lighting, libraries, social services, and whatever else is communally available but always in short supply. The slum, then, is an area where the population lacks resources to compete successfully, and where collectively they lack control over the channels through which such resources are distributed or obtained.
 
 
 266
 Thomas D. Sherrard, Social Welfare and Urban Problems 10-11 (1968); see also Dennis Young, How Shall We Collect the Garbage? A study in Economic Organization 69-71 (1972) (noting that in Washington D.C. and New York City, lower income areas received inferior garbage collection services); Robert P. Inman & Daniel L. Rubinfeld, The Judicial Pursuit of Local Fiscal Equity, 92 Harv. L.Rev. 1662, 1675 (1979) (with respect to street repairs, sanitation, urban renewal, and parks and recreation, empirical evidence suggests that central city families with $10,000 yearly incomes receive, on average, 25% more in services than families with $5,000 incomes, and families with $20,000 incomes receive an additional 25% more than $10,000 income families); Clifford J. Levy, Sanitation Cutbacks Hit Poorer Districts Hardest, N.Y. Times, April 18, 1993, § 1, at 37 ("The sharp cuts in New York City's sanitation budget during the fiscal crises of 1990-91 have hit poor, minority residents far harder than wealthier ones, scarring once-orderly blocks in neighborhoods like Harlem, Bedford-Stuyvesant and the South Bronx.").
 
 
 267
 Hawkins v. Town of Shaw, 437 F.2d 1286, 1288 (5th Cir.1971), aff'd on reh'g, 461 F.2d 1171 (5th Cir.1972) (en banc), presents a particularly poignant example of the misapplication of municipal resources. In Hawkins there were gross disparities in treatment between the African-American and White neighborhoods of the town with respect to street paving, street lighting, traffic controls, surface water drainage, and sewage treatment. Among other things, the court found undisputed evidence of the following incongruities: While 99% of the town's White population had access to sanitary sewers, only 80% of the town's African American population enjoyed the same facilities; 98% of all the town's homes that fronted on unpaved streets belonged to African Americans; and while the town's White neighborhoods were provided with a continuous system of drainage ditches, the town's African American neighborhoods had poorly maintained systems, and on many streets, none at all. See Hawkins v. Town of Shaw, 437 F.2d 1286, 1288 (5th Cir.1971), aff'd on reh'g, 461 F.2d 1171 (5th Cir.1972) (en banc). The Fifth Circuit found that these troubling discrepancies constituted a violation of the Equal Protection Clause. See id. at 1171, 1291; see also Dowdell v. City of Apopka, 698 F.2d 1181 (11th Cir.1983) (discrimination in street paving, water distribution and storm drainage); United Farmworkers of Florida Hous. Project, Inc. v. City of Delray Beach, 493 F.2d 799 (5th Cir.1974) (city officials had deprived farmworkers of equal protection of law by refusing to extend water and sewage service to proposed federally funded low income housing project); Baker v. City of Kissimmee, 645 F.Supp. 571 (M.D.Fla.1986) (city intentionally discriminated against African Americans by failing to provide equal municipal services of street paving, resurfacing, and maintenance); Ammons v. Dade City, 594 F.Supp. 1274 (M.D.Fla.1984), aff'd, 783 F.2d 982 (11th Cir.1986) (granting injunctive and declaratory relief on civil rights claim by African American residents who were denied equal municipal services of street paving, street resurfacing and maintenance, and storm water drainage facilities on the basis of race); Johnson v. City of Arcadia, 450 F.Supp. 1363 (M.D.Fla.1978) (discrimination in street paving, parks and water supply); Selmont Improvement Ass'n v. Dallas County Comm'n, 339 F.Supp. 477 (S.D.Ala.1972) (failure to pave roads in African American communities); cf. Michele L. Knorr, Environmental Injustice, 6 U. Balt. J. Envtl. L. 71, 77-84 (1997) (summarizing evidence of discrimination against minority and low-income communities with respect to pollution and hazardous waste disposal); Edward P. Boyle, Note, It's Not Easy Bein' Green: The Psychology of Racism, Environmental Discrimination, and the Argument for Modernizing Equal Protection Analysis, 46 Vand. L.Rev. 937, 968 (1993) ("A substantial amount of evidence shows that environmental discrimination is a national phenomenon."); Rachel D. Godsil, Note, Remedying Environmental Racism, 90 Mich. L.Rev. 394, 397 (1991) ("A host of studies have concluded that minorities are exposed to a higher level of pollution of all forms than are whites."); Marianne Lavelle & Marcia Coyle, Unequal Protection: The Racial Divide in Environmental Law, Nat'l. L.J., Sept. 21, 1992, at S2 (concluding from results of study that "federal government, in its cleanup of hazardous sites and its pursuit of polluters, favors white communities over minority communities under environmental laws meant to provide equal protection for all citizens").
 
 
 268
 The addition of another layer in the city bureaucracy removes the residential tenants of the GCDMA further from the policy making process which decides how municipal services are provided in their neighborhood. It is impractical to think that the residential tenants of BIDs such as the GCDMA will be able to continually and effectively pressure the City into interceding on their behalf in the BID's affairs.
 
 
 269
 C. Real Estate Owners' and Commercial Interests' Power
 
 
 270
 The contention that non-property owners will be able to influence City government to control their BIDs is particularly troubling because of the political strength in New York of landholders who do control the BIDs' boards. The real estate lobby enjoys a powerful influence in local New York politics. Through contributions to candidates and other means, owners of large real estate holdings in the City already possess a substantial advantage in some respects over residential tenants in the struggle to affect the course of local decisions affecting municipal services. See, e.g., Tom Schachtman, Skyscaper Dreams: The Great Real Estate Dynasties of New York, 8-9, 11, 18, 20-21, 40-41, 241, 282, 286, 295-296, 315-316 (New York City and State officials since Boss Tweed have traded political favors to large real estate interests for contributions); Clifford J. Levy, Developer Ranks No. 1 in Spending on Lobbyists, N.Y. Times, May 15, 1997, at B5; Richard Perez-Pena, Landlords Quietly Increased Donations to Fight Rent Law, N.Y. Times, May 5, 1997, at A1; Peter Dreier, The Landlords Stage a Rent Strike, 264 The Nation 17 (June 23, 1997) ("Over the past five years [the real estate lobby] dramatically increased campaign contributions ... making the industry one of the biggest donors in [New York] state politics."); cf. Miles Maguire, Big Spenders Spent, Washington Times, Nov. 27, 1991, 1991, at A1 ("[T]he real estate industry has traditionally been one of the biggest and most reliable cash machines for candidates.").
 
 
 271
 It is unreasonable to expect that City-wide officials will be more interested in the political needs of those without wealth when the interests of these constituencies have been divided and diffused among dozens of mini-municipalities spread throughout the City. The most likely effect of the proliferation of BIDs is that City officials will become less, not more, attuned to the political needs of the non-property holders when those needs conflict with those of the real estate owners.
 
 
 272
 It is misguided to think the attenuated possibility of occasional City intervention can justify the exclusion of non-property holders from the day-to-day governance of the BID through exercise of the right to vote. Without the vote, tenants cannot overcome the political leverage provided by the money of real estate owners.
 
 
 273
 VI. THE DISENFRANCHISEMENT OF URBAN POPULATION
 
 
 274
 If BIDs such as the GCDMA are not held to the one person, one vote requirement of the Fourteenth Amendment, there is a significant risk that a substantial portion of this country's urban population will be effectively prevented from controlling much of local government.
 
 
 275
 Cities today are utilizing BIDs in increasing numbers and experimenting with their use in new and different circumstances. New York City, for example, has considered a BID in a purely residential area in order to place approximately 500 "private" security guards in the Upper East Side of Manhattan. See Joyce Purnick, Plan for Private Police Force Sets Off Alarms on Upper East Side, N.Y. Times, May 29, 1995, § 1, at 25.
 
 
 276
 While it is true that the District Plan provides that general municipal services will not be reduced within the district as a result of the GCDMA's presence, there is nothing to prevent the City from reducing the services it provides on a City wide basis as a result of its reliance on the City's growing number of BIDs. BIDs decrease both the need and the incentive for the City to expand or maintain the general municipal services it provides to the City as a whole. See, e.g., Clifford J. Levy, Sanitation Cutbacks Hit Poorer Districts Hardest, N.Y. Times, April 18, 1993, § 1, at 44 (describing allegations that BIDs are "Balkanizing New York City by fostering an every-neighborhood-for-itself attitude"); see also Jonathan Kozol, Amazing Grace 109-110 (1995) (characterizing BIDs as "another stage in the secession of the fortunate from common areas of shared democracy").
 
 
 277
 As more BIDs are created, the level of general services may decline still further, and even more BIDs will be needed to provide traditional public services to more favored areas and groups. New York City's Mayor, Rudolph Giuliani, aptly summarized the growing centrality of New York City's BIDs as providers of municipal services when he observed, "[t]hey are filling in for government." See Thomas J. Lueck, Business Districts Grow at Price of Accountability, N.Y. Times, Nov. 20, 1994, § 1, at 1.
 
 
 278
 When BIDs multiply in number and expand into new and innovative uses, they constitute an ever larger portion of the public sphere. Unless BID boards are elected in a democratic fashion, the result of this trend may be the effective disenfranchisement of a substantial percentage of our urban population.
 
 
 279
 Appellees argue that this loss of voting power is justified because BIDs provide services which are only "supplemental" to the municipal services provided by the City. Yet, there appears to be no principled way to distinguish services which are "supplemental" from those which are "essential." Virtually every municipal service is "supplemental" in the sense that city residents can survive with a reduction in the service. Trash may be collected several times a day in a BID, but it need not be collected as often in non-BID areas if the only requirement is that the City provide the most "basic" service. As larger and larger numbers of New Yorkers come under the umbrella of BIDs, on what basis shall it be determined that a service is sufficient to constitute the minimum floor for non-BID residents? Today the GCDMA spends some $12 million per year on the provision of services. How high must that figure rise until their services are important enough to qualify for constitutional scrutiny?
 
 
 280
 It is not necessary here to address the issue of whether the increasing use of BIDs raises Equal Protection issues with respect to the provision of city-wide services. The point is that a BID which performs as many services to the degree that the GCDMA does cannot be categorized as a "supplemental" provider.
 
 
 281
 BIDs are capable of favoring certain residents or interests over others and of discriminating against particular constituencies within the BID. To allow a particular constituency to control the governance of a BID by giving it extra voting power not only allows this form of discrimination but invites it.
 
 
 282
 Increased reliance on BIDs such as the GCDMA raises a serious threat of possible abuses that could ensue if business improvement districts began to encompass more communities which, for one reason or another, are already subject to discriminatory policies with regard to municipal services. Residents in such areas would be effectively disenfranchised because they already lack the resources necessary to effectively influence local government.
 
 
 283
 One of the basic powers that the poor and minorities have is the right to have their voices heard at the polls. Taking away or reducing the right of district residents to cast an equally weighted vote on the board of directors of a business improvement district, given the control that such a board has over the provision of substantial municipal services, undercuts one of the critical reforms of the post World War II period, namely the right of every citizen to participate fully and equally in government.
 
 
 284
 Appellee GCDMA rather sensationally predicts that the application of the one person, one vote principle to the GCDMA will be "certain to destroy" the BID. Brief of Defendant-Appellee Grand Central District Management Assoc., Inc. at 12. To the contrary, there is little reason to think that a BID cannot survive under a more democratic scheme than that employed by the GCDMA. At least two states provide for equal voting rights for the residents of their BIDs. See Colo.Rev.Stat. §§ 31-25-1203(4), 31-25-1209(d) (Supp.1996) (board elected by those who own or lease property within district and those whose primary dwelling place is within district); Fla. Stat. Ann. §§ 190.003(16), 190.006(3)(a)2.a, 163.514(16) (West Supp.1998) (after initial phase, board members elected by landowners and all registered voters who reside within the district).
 
 
 285
 Even if it were true that some BIDs could not survive as democratic institutions, it does not follow that we should therefore bend our constitutional principles. In determining whether BIDs are subject to the one person, one vote requirement, it is necessary to consider not only the benefits of BIDs but the constitutional threat posed by the growth of unrepresentative and non-democratically elected BIDs.
 
 VII. UNCONSTITUTIONALITY ON FACE
 
 286
 The state statute and city law which require a majority of the board to be land owners itself violates the one person, one vote principle. While there may be many instances in which these statutory requirements do not lead to a constitutionally infirm voting structure, the statutes are overbroad because they require the boards of all districts, regardless of their geographic or demographic compositions, to be weighted in favor of landholders. The state statute states plainly that a majority of members of the board of directors shall be representatives of real property owners. This would apply if there were only two real estate owners and ten thousand tenants. It reads as follows:
 
 
 287
 The board of directors of the association shall be composed of representatives of owners and tenants within the district, provided, however, that not less than a majority of its members shall represent owners and provided further that tenants of commercial space and dwelling units within the district shall also be represented on the board.
 
 
 288
 N.Y. Gen. Mun. Law § 980-m(b) (McKinney Supp.1998) (emphasis added). New York City's law contains identical statutory language. See N.Y. City Admin. Code § 25-414(b) (1990).
 
 
 289
 The statute leads to an unconstitutional result in cases such as this one where the residents outnumber by approximately four to one the corporate entities or individuals owning real estate in the district. In other districts the statute will dictate even more inequitable results. Despite their name, there is nothing in the authorizing statute, as already pointed out, which requires that "Business" Improvement Districts be located in commercial areas. The establishment of a BID in a purely residential area is a possibility which has been contemplated and actively pursued by some supporters of the privatization of public functions. See Joyce Purnick, Plan for Private Police Force Sets Off Alarms on Upper East Side, N.Y. Times, May 29, 1995, § 1, at 25 (reporting proposal to create BID which would add a police force of approximately 500 guards to the Upper East Side of Manhattan). If BIDs are to be utilized for residential purposes, they may be inhabited by an increasingly high ratio of tenants and residents who do not hold official title to the properties in which live. The inflexible standard favoring real property owners enforced by the state and city laws may produce increasingly inequitable and unconstitutional results as cities continue to experiment with BIDs.
 
 VIII. SUMMARY JUDGMENT INAPPROPRIATE
 
 290
 It is undesirable to attempt to make a highly fact-specific analysis of the GCDMA's activities on a motion for summary judgment without the benefit of a full record. Important factual questions remain which should be answered before a definitive ruling is appropriate. The current record is incomplete with respect to the level of oversight exercised by the City over the GCDMA, for example. An empirical question remains unanswered concerning how many property owners in the district are passing on the costs of the assessments to their tenants. Another important question may be whether the City has reduced or curtailed city-wide services as a result of its reliance on the BIDs.
 
 IX. CONCLUSION
 
 291
 Today the strength of our republican system of government is being sapped in New York City by the proliferation of non-democratically controlled quasi-public entities known as Business Improvements Districts. While these innovative sub-units of local government have been properly praised for some of the advantages they have brought to American cities, the benefits which BIDs have to offer may not be secured at the cost of one of our most prized democratic and republican principles--equality of the vote.
 
 
 292
 The decision to exempt the GCDMA from the fundamental requirements of our electoral form of government is particularly disappointing in light of the practical difficulties many Americans already face in securing fair treatment in the provision of local governmental services. The law should not tear down political safeguards against such discrimination.
 
 
 293
 The GCDMA utilizes municipal tax funds to provide many governmental services which are of fundamental importance to the residential tenants who live within the 75 block area of the Grand Central BID. Its powers are far broader than those involved in Hadley and include such typical governmental functions as security, sanitation, social services, capital improvements, transportation improvements, and public events.
 
 
 294
 The GCDMA employs broad discretion in determining how, when, and where these services will be provided and who will derive the most benefit from them. The residents of the district, to whom many of these assessments are likely to be passed on in the form of higher rents, are entitled to a meaningful vote in the election of the governing board of the GCDMA.
 
 
 295
 Effective exclusion from the electoral process of so many may benefit the select minority wishing to control how municipal funds are expended within the district, but it is not permitted under our Constitution. Such weighted voting in these mini-cities--the BIDs--in favor of some segments of society is not compatible with the one person, one vote requirement of American law or with the basic principles of our nation's republican form of government.
 
 
 
 *
 Honorable Jack B. Weinstein, of the United States District Court for the Eastern District of New York, sitting by designation